IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

Kaitlyn Porter,                    :
                                   :
        Plaintiff,                 :
                                   :
        vs.                        :    Case No.
                                   :    2:21-cv-04077
Two Guys and a Calculator :
LLC, et al.,                       :
                                   :
        Defendants.                :

- - -

DEPOSITION OF KAITLYN PORTER

- - -

                              Tuesday, April 26, 2022
                              10:08 a.m.
                              The Spitz Law Firm
                              1103 Schrock Road
                              Suite 307
                              Columbus, Ohio  43229

- - -

MARILYN K. MARTIN, RPR

REGISTERED PROFESSIONAL REPORTER

- - -

ANDERSON REPORTING SERVICES, INC.
3040 Riverside Drive, Suite 125
Columbus, Ohio  43221
(614) 326-0177

1    APPEARANCES:

2              TRISHA BREEDLOVE, Attorney at Law
               The Spitz Law Firm
3              1103 Schrock Road, Suite 307
               Columbus, Ohio  43229
4              (216) 291-4744
               trisha.breedlove@spitzlawfirm.com
5
                    On behalf of the Plaintiff.
6
               ERIC HERSHBERGER, Attorney at Law
7              Haynes, Kessler, Myers & Postalakis, Inc.
               300 West Wilson Bridge Road, Suite 100
8              Worthington, Ohio  43085
               (614) 764-0681
9              eric@ohiolawyersgroup.com

10                  On behalf of the Defendants.

11                       - - -

12   ALSO PRESENT:

13             Joy Caudill

14                       - - -

15

16

17

18

19

20

21

22

23

24

3

```
                              TUESDAY MORNING SESSION
                              April 26, 2022
                              10:08 a.m.

                       -  -  -

                  STIPULATIONS

                       -  -  -

        It is stipulated by and between counsel
for the respective parties herein that this
deposition of KAITLYN PORTER, a Plaintiff herein,
called by the Defendants under the statute, may be
taken at this time and reduced to writing in
stenotypy by the Notary, whose notes may thereafter
be transcribed out of the presence of the witness;
and that proof of the official character and
qualifications of the Notary is waived.

                       -  -  -
```

```
1                    I N D E X

2                      - - -

   WITNESS                        PAGE
3
   KAITLYN PORTER
4
            Cross-Examination        06
5           (By Mr. Hershberger)

6                      - - -

7  EXHIBITS                        MARKED

8  Defendant's Exhibit A           108
   (Notice)
9
   Defendant's Exhibit B           112
10 (Charge of Discrimination)

11 Defendant's Exhibit C           XX
   (Not Used)
12
   Defendant's Exhibit D           134
13 (Text Messages)

14 Defendant's Exhibit E           XX
   (Not Used)
15
   Defendant's Exhibit F           51
16 (PRP Employment Application)

17 Defendant's Exhibit G           55
   (Document Entitled "Application
18  for Employment")

19 Defendant's Exhibit H           61
   (Personnel Action Form)
20
   Defendant's Exhibit I           66
21 (Not Used)

22 Defendant's Exhibit I-2         68
   (Anchor Security and Logistics Employment
23  Application)

24
```

```
 1    Defendant's Exhibit J                        88
      (Gap Documents)
 2
      Defendant's Exhibit K                        94
 3    (Burger King Documents)

 4    Defendant's Exhibit L                        95
      (Liberty Tax Application for Employment)
 5
                                - - -
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Kaitlyn Porter**
**4/26/2022**

```
 1              P R O C E E D I N G S

 2                      - - -

 3              KAITLYN PORTER,

 4   being by me first duly sworn, as hereinafter

 5   certified, testifies and says as follows:

 6              CROSS-EXAMINATION

 7  BY MR. HERSHBERGER:

 8   Q.        Ma'am, for the benefit of the record, can

 9   you state your name.

10   A.        Kaitlyn Porter.

11   Q.        I'm Eric Hershberger, and I represent the

12   defendants in a lawsuit that you've brought.  We're

13   here today for your deposition.  I don't suppose

14   you've ever had a deposition taken before, have you?

15   A.        No.

16   Q.        This is probably the only time short of a

17   trial that I'm going to get an opportunity to ask you

18   questions under oath and actually get to know what it

19   is that you know short of something really going awry

20   here today by way of additional information or

21   documents or information that I haven't seen.  This

22   is my, kind of, singular stab to find out what you

23   know about the allegations in the lawsuit, the

24   witnesses, the documents, my clients' defenses, et
```

```
 1   cetera.
 2              So it's going to be somewhat of a
 3   deliberative process.  I'm going to try to move you
 4   through it expeditiously.  Everything that's being
 5   said here is being taken down by the court reporter
 6   to my right, who is very good and is already
 7   challenged with a few of the $20 words that come out
 8   of my mouth.  So I will try to slow down.
 9              And my obligation to you is to give you a
10   clear question.  And your obligation, quite frankly,
11   if we're going to have this agreement is:  If you
12   don't understand my question, just let me know; and
13   I'll rephrase it.  My goal here is to get information
14   from you, not to torture you.  So if you need to take
15   a break to use the restroom -- I don't know if you
16   smoke -- or whatever happens, if you need to take a
17   break, just let me know.
18              The caveat to that is:  I'm not going to
19   let you take a break if there's a question pending
20   unless it's going to call for some privileged
21   communication that you and Trisha need to talk about.
22   And on that occasion, we're going to have a break
23   probably anyhow because Trisha will be calling for
24   it.
```

```
 1                   Kaitlyn, do you recognize Joy Caudill
 2     sitting next to me?
 3     A.          Yes.
 4     Q.          I'm going to do a bunch of background
 5     questions.  But I guess the first thing is:  Are you
 6     actually married?
 7     A.          I am.
 8     Q.          Okay.  When did you get married?
 9     A.          February 22.
10     Q.          Okay.  Of?
11     A.          This year.
12     Q.          Of 2022?
13     A.          Yes.
14     Q.          Congratulations.
15     A.          Thank you.
16     Q.          Is it Shaniqua?  Is that your spouse's
17     name?
18     A.          Yes.
19     Q.          Okay.  So 2/22/22?
20     A.          Yes.  We waited for the date.
21     Q.          I was going to say:  In a Pee Wee Herman
22     sort of way you meant to do that, right?
23     A.          Yes.
24     Q.          Well, congratulations.  Prior to your
```

1   marriage to Shaniqua, had you been married before?

2   A.        Yes.

3   Q.        Can you tell me -- How many times have you

4   been married other than Shaniqua?

5   A.        Just the one time.

6   Q.        What was the name of your spouse?

7   A.        Patrick Holland.

8   Q.        And when were you and Patrick married?

9   A.        2009 to '11.

10  Q.        And was there a divorce or a dissolution

11  of that marriage?

12  A.        Divorce.

13  Q.        And who filed for that divorce?

14  A.        I did.

15  Q.        And do you remember what grounds you

16  alleged to get the divorce against Patrick?

17  A.        I don't remember.

18  Q.        Where was the divorce filed?

19  A.        Franklin County.

20  Q.        Do you remember the name of the lawyer

21  that you used for the divorce?

22  A.        Robert Bracco.

23  Q.        As we sit here today, I understand there

24  were children born of your marriage to Patrick.

1    A.        Yes.

2    Q.        Two?

3    A.        One.

4    Q.        One?

5    A.        Yes.

6    Q.        Do you have another child?

7    A.        Yes.

8    Q.        How old is your oldest child?

9    A.        Fourteen.

10   Q.        And what's his or her name?

11   A.        Camberly Porter.

12   Q.        And your next oldest child?

13   A.        Kassidy Holland.

14   Q.        And how old is she?

15   A.        She's 12.

16   Q.        Is there a support obligation in your

17   divorce case with regard to your son, Camberly?

18   A.        My daughter, no.

19   Q.        Your daughter.  I'm sorry.

20             Is there a support obligation with regard

21   to Kassidy?

22   A.        Yes.

23   Q.        And who is that support obligation

24   against?

Kaitlyn Porter
4/26/2022

```
 1    A.          Patrick Holland.

 2    Q.          So I'm not rolling my eyes.  I'm already

 3    confused.  I think you said there was one child born

 4    of your marriage.  Was there one born before you were

 5    married to Patrick?

 6    A.          Yes.

 7    Q.          That explains it.

 8                Other than Porter and Holland, have you

 9    been known by any other names --

10    A.          No.

11    Q.          -- last names?

12                Kaitlyn, do you mind if I you call you

13    Kaitlyn?

14    A.          Sure.

15    Q.          Where do you live today?  Where do you

16    reside?

17    A.          In Columbus.

18    Q.          What's the address there?

19    A.          3664 Soft Wind Drive.

20    Q.          And what's the ZIP?

21    A.          43232.

22    Q.          How long have you lived there?

23    A.          Since February 1.

24    Q.          Of 2022?
```

```
 1   A.          Yes.

 2   Q.          Prior to the Soft Wind Drive address,

 3   where did you reside?

 4   A.          529 Sawyer Boulevard, Apartment 214,

 5   Columbus, Ohio, 43203.

 6   Q.          And how long did you live on the Sawyer

 7   Drive or Sawyer Road address?

 8   A.          For a year.

 9   Q.          A year?

10   A.          Uh-huh.

11   Q.          Is that a yes?

12   A.          Yes.

13   Q.          I'm sorry.  I don't usually mean to launch

14   all the rules.  I think two of them that will help

15   is:  I'll try not to talk over you or anticipate your

16   answer.  But also, if you say yes or no instead of

17   huh-uh or uh-huh --

18   A.          I understand.  It's habit.

19   Q.          -- we won't have to argue about what that

20   means.  Thank you.

21               Prior to Sawyer Road, where did you live?

22   A.          At 7005 Westfall Road Southwest.  That

23   would be in Lancaster, Ohio.

24   Q.          That's Fairfield County?
```

Kaitlyn Porter
4/26/2022

1    A.        Yep.  43130.

2    Q.        How long approximately did you live at the

3    Westfall address?

4    A.        A little over a year.

5    Q.        Kaitlyn, I meant to ask you this question

6    further, and it's not meant to insult your

7    intelligence other anything else.  It's just a

8    standard question.  As you sit here today, are you

9    under -- have you had any alcohol or drugs consumed

10   in the last 24 hours?

11   A.        No.

12   Q.        Did you get a good night's sleep?

13   A.        Yes.

14   Q.        Can you think of any reason why your

15   memory might be impaired today other than the fact

16   that you're giving your singular deposition that

17   you've ever given in your life?

18   A.        No.

19   Q.        Prior to the Westfall address in Lancaster

20   where you lived for a year, where did you live prior

21   to that?

22   A.        In Columbus on Canonby.  I don't remember

23   the address.  Canonby Place was --

24   Q.        And maybe a different way to approach

```
 1   this, Kaitlyn, would be this:  You applied for

 2   employment at my client's Liberty franchise -- or

 3   Liberty Tax franchise in January of 2021?

 4   A.        Uh-huh.

 5   Q.        Is that a yes?

 6   A.        Yes.

 7   Q.        Where were you living then?

 8   A.        Lancaster.

 9   Q.        Was that on Westfall or somewhere else?

10   A.        Yes.  Westfall.

11   Q.        It sounds like Westfall is a familial

12   address.  Do you have a parent or an aunt or someone

13   that lives there?

14   A.        My mom, yes.

15   Q.        And what's your mom's name?

16   A.        Kathy.

17   Q.        And what's her last name?

18   A.        Weber, W-E-B-E-R.

19   Q.        With regards to the Soft Wind Drive

20   address where you currently reside and the Sawyer

21   Road or Drive address that you had testified to and

22   the Westfall Road address in Lancaster where you

23   lived for a year, with regard to those three

24   addresses, Kaitlyn, did Shaniqua live with you at all
```

Kaitlyn Porter
4/26/2022

1    three of those address?

2    A.         No.  Just the current one.

3    Q.         So prior to Soft Wind, you maintained

4    separate residences?

5    A.         Yes.

6    Q.         Kaitlyn, I sent out a deposition notice.

7              MR. HERSHBERGER:  And, Trisha, this is

8    more of a formality.  I don't see any documents here

9    today.  Is it fair there's not going to be any more

10   documents?

11             MS. BREEDLOVE:  Correct.

12             MR. HERSHBERGER:  Fair.

13   BY MR. HERSHBERGER:

14   Q.         Kaitlyn, at the time that you were

15   terminated, did you have a feeling on the date that

16   you found out you were terminated that you felt

17   something wrong had been done to you?

18   A.         Yes.

19   Q.         Okay.  Do you have a cell phone?

20   A.         Yes.

21   Q.         What sort of platform are you using?  Are

22   you an Android person or an Apple person?

23   A.         Apple.

24   Q.         How long have you had your iPhone?

Kaitlyn Porter
4/26/2022

1    A.        The current one?

2    Q.        Yeah.

3    A.        Three months.

4    Q.        Okay.  Some people are really brand loyal.

5    And I'll admit to being one of those persons because

6    I don't want to have to learn new technology, so I've

7    been an Apple guy for a while.  Is that somewhat the

8    same with you?  You used an Apple iPhone fairly

9    continuously?

10   A.        Yes.

11   Q.        Do you back up things to the Cloud on your

12   iPhone?

13   A.        Unfortunately, not like I should.

14   Q.        And how did you learn about that being an

15   unfortunate circumstance?

16   A.        I recently lost a phone and had to order a

17   new one through my insurance and found that none of

18   my stuff was still there.

19   Q.        And would that be like your contacts, your

20   calendar appointments, your email, all of that stuff?

21   A.        Text messages, pictures.  Yep.

22   Q.        Well, with regard to the date that you

23   were terminated, were there texts on your phone

24   between you and Joy Caudill?

```
 1   A.          On that day, yes.
 2   Q.          And it was part of a larger trail of text
 3   communications between you and Joy?
 4   A.          Yes.
 5   Q.          Have you seen the text communications that
 6   have been produced by the defendants in discovery in
 7   this case between you and Joy?
 8   A.          Yes.
 9   Q.          And we'll get to this in a moment because
10   it's a fairly voluminous document.  I don't want to
11   have to go over it right now.  But do you have
12   anything that you're aware of that would supplement
13   those texts that you've maintained on your phone and
14   printed out anywhere?
15   A.          No.
16   Q.          Aside from the text messages between you
17   and Joy, did you have text conversations between you
18   and Tony Marucco?
19   A.          Not that I can remember, but it is
20   possible.  I think I talked to him over the phone
21   though, not via text.
22   Q.          Other than a driver's license, do you hold
23   any other licenses in Ohio?
24   A.          I don't think so.
```

1    Q.      Okay.  I saw in some background that at

2    one point you were a state tested nurse's aide.  And

3    I don't know if that's a license or a certification.

4    A.      It is, but you have to recertify every

5    five years, which I think is why I think it's now

6    expired.

7    Q.      When did you obtain your STNA

8    certification or licensure?

9    A.      2014 maybe.

10    Q.      And when is the last time you worked in

11    the field of providing nurse aide services?

12    A.      2016 or '17 maybe.

13    Q.      There's a name that came up in your

14    disclosures in this case of Ariel Fuller.

15    A.      Uh-huh.

16    Q.      What relationship -- Was she a coworker

17    with you?

18    A.      Yes.  She was my manager at West Gate.

19    Q.      Have you had an opportunity to talk with

20    Ariel during the pendency of your lawsuit?

21    A.      Yes.

22    Q.      And when is the last time you spoke with

23    Ariel?

24    A.      Probably about two months ago.

```
 1    Q.         Would you consider her a friend?
 2    A.         I would consider her an acquaintance.  We
 3    don't hang out outside of work or anything.
 4    Q.         Do you text her?
 5    A.         No.
 6    Q.         Call her?
 7    A.         Yes.
 8    Q.         Was Ariel a witness to your termination
 9    from Two Guys and a Calculator as far as you're
10    aware?
11    A.         She was not a witness to the termination
12    itself, no.
13    Q.         To your understanding, does Ariel have any
14    knowledge or has she expressed to you any knowledge
15    of the circumstances surrounding your termination?
16    A.         Yes.
17    Q.         And what has she told you?
18    A.         As it pertains to?
19    Q.         Her knowledge of the circumstances
20    surrounding your termination.
21    A.         I guess I need a more specific question.
22    Q.         And I had asked you -- And this may be an
23    example of:  I don't want you answering a question if
24    you don't understand it.  I had asked you if you had
```

1  spoken with Ariel Fuller and whether she had

2  expressed any knowledge of the circumstances

3  surrounding your termination.  I believe your answer

4  to that question was yes.  So I'm just piggybacking

5  off of that.

6          Maybe a more broad questions is:  If Ariel

7  was not there during your termination, has Ariel told

8  you how she -- if she has acquired any acknowledge,

9  how she acquired knowledge of the facts or

10  circumstances in her mind of why you were terminated?

11 A.      She has been witness to how -- when I was

12 a receptionist, I was kind of forced out of my

13 position and the general situation or environment

14 that ended up causing me to be in Reynoldsburg and

15 how that happened --

16 Q.      Okay.

17 A.      -- as it just wasn't quite fair or right.

18 So --

19 Q.      I'm going to jump around a little bit

20 here, and bear with me.  You indicated that you were

21 married to Shaniqua in February of this year and to

22 Thomas --

23 A.      Patrick.

24 Q.      Patrick.  Excuse me.  I knew it was an

1    Irish name.

2                  -- Patrick in 2011?

3    A.        Uh-huh.

4    Q.        Would you consider your sexual orientation

5    to be heterosexual, homosexual or bisexual?

6    A.        I would say I'm a lesbian.

7    Q.        And if I use the words -- I'm 56, so I'm

8    ancient.  So forgive me.  I'll try to use the word

9    lesbian to describe your sexual orientation; but if I

10   use gay or homosexual, just bear with me.  I'm not

11   trying to dead name or dead orient anyone.  I just

12   want to set that as kind of a ground rule so that as

13   I ask these questions we're moving forward on the

14   same page.

15                  Kaitlyn, you're openly gay obviously.  How

16   long have you been openly gay?

17   A.        I would say about eight or nine years now.

18   Q.        Kaitlyn, how many times were you at the

19   Reynoldsburg location of Two Guys and a Calculator or

20   Liberty Tax?

21   A.        I can't really remember, but I'd say only

22   once or twice.  I think I was there only one day.

23   Q.        And on that one day, what did you do?

24   A.        I shadowed a man -- I can't remember his

```
 1    name.  It was the old owner of the location -- while

 2    he did taxes for the day.

 3    Q.          And what does shadowing entail at least at

 4    Liberty Tax?

 5    A.          Sitting behind somebody and watching over

 6    their shoulder.

 7    Q.          If you'll excuse this -- and I understand

 8    my client's representatives and one of the defendants

 9    in the case is sitting right beside me.  But that

10    sounds kind of boring.  Are you taking notes while

11    you're shadowing?

12    A.          Yes and no.  Notes at this point in time

13    are irrelevant because you've been through tax

14    school.  So you're really observing how the program

15    works and how things like rounding numbers are going

16    on and how they move through the system, which forms

17    they use, things like that.

18    Q.          Were you interacting verbally with the

19    gentleman that you were shadowing, asking him

20    questions or asking him how or why he does things?

21    A.          Yes.

22    Q.          So other than your interaction with this

23    one person at the Reynoldsburg store you think on one

24    occasion, do you remember anyone else at
```

1   Reynoldsburg -- at the Reynoldsburg location?

2   A.          Other than the client we worked with,

3   there was an elderly receptionist.  I don't remember

4   her name.  But I think she worked, like, part-time.

5   Q.          Do you know of anyone else at Liberty Tax,

6   the Two Guys and a Calculator franchise of Liberty

7   Tax, who are -- I'm just going to use a broad term --

8   homosexual, whether they're male or whether they're

9   female?

10  A.          Not that I know of.

11  Q.          How was it that -- And I'm going to make a

12  joke, but bear with me because sometimes if you ask a

13  guy or a person who is into fitness, what they do

14  with their time, they'll say, "This is what I do."

15  You don't even have to ask them.  They'll just tell

16  you.  Sometimes people go to a gym, you know, this

17  guy is like, "I do this" or whatever or, "I bike" or,

18  "I'm a fan of the Crew."

19          And for some people their sexual

20  orientation is like that because they're out, open

21  and maybe they're seeking relationships.  And they're

22  obviously not concerned with, you know, the stigma

23  that society has historically tried to place on

24  people that are gay.  So I'm trying to figure out how

1   it is that people knew you were gay, if anybody.  So

2   who at Liberty Tax knew that you were gay?

3   A.          You probably wouldn't openly know, as I

4   don't walk around explaining it, unless you came in

5   contact with my spouse while I was at work.  So Ariel

6   knew, as I frequently had lunch delivered by my

7   spouse.  Her sister was aware because she worked with

8   us in the same location.

9   Q.          And who is Ariel's sister?

10  A.          Let me remember her name.  I don't

11  remember her name.  I can't remember -- I can't think

12  of it because you asked me so fast.  But she worked

13  in the same location with her, underneath her.

14  Q.          If it comes back to you, just let me know.

15  A.          Sure.

16  Q.          So Ariel, Ariel's sister.  Anyone else

17  that knew that you were a lesbian?

18  A.          Other than Joy the last day, no.  I don't

19  think it would have come up, to be honest.

20  Q.          I'm not going to try to argue with you.

21  But there's -- At this point, lots of people have

22  their lunch delivered by lots of other people.

23  A.          Sure.

24  Q.          So what was it, if anything, that led to

1   the revelation or the discussion, if you will, of

2   your sexual orientation between you and Ariel just by

3   virtue of the fact that Shaniqua was delivering meals

4   to you?

5   A.          She was also going through tax school with

6   the company.  And so she would frequently be around

7   for conversation that would be for the tax school,

8   so, you know, "How do I do this?  What is that?"  She

9   would ask questions while she was there for Ariel.

10             So I think in conversation, they began to

11  know each other a little bit.  And they asked

12  questions themselves, which led them to understand

13  each other, and she introduced herself as so.

14  Q.          Okay.  Ariel didn't indicate as far as

15  you're aware that she was gay or a lesbian rather?

16  A.          No.  I believe she's married, from what

17  she indicated.

18  Q.          So this disclosure of your sexual

19  orientation and Shaniqua's sexual orientation came up

20  as casual conversation kind of unrelated to your work

21  duties at Liberty Tax, fair?

22  A.          Correct.

23  Q.          And was this at the West Gate location?

24  A.          Yes.

1    Q.         And how many days -- As you said, you were

2    at Reynoldsburg the one day.  How many days were you

3    at West Gate?

4    A.         The length of my employment minus the

5    times I would cover shifts at Lincoln Village for

6    close.

7    Q.         And who was your supervisor at West Gate?

8    A.         From my understanding, it would have been

9    Ariel; and then Ariel's would have been -- I think

10   his name was Dave.  I can't remember.

11   Q.         And then at Lincoln Village, who was your

12   supervisor?

13   A.         Joy.

14   Q.         And how many times do you think you were

15   at Lincoln Village, filling in over there?

16   A.         A handful of times I would say.  I can't

17   remember exactly how many, but maybe five or ten.

18   Not too many.

19   Q.         Were there times that Shaniqua and you

20   were over at Lincoln Village working together?

21   A.         Shaniqua did not work for the company.

22   She was just going through tax school, so she never

23   worked with me.

24   Q.         Fair.  Were there times at Lincoln Village

1  where you were working there as a receptionist that

2  Shaniqua would bring you lunch?

3  A.        Yes.

4  Q.        Kaitlyn, can you give me a -- I want to

5  discuss your educational history.  So you graduated

6  from high school I'm assuming.

7  A.        I took my GED.

8  Q.        Okay.  Your GED?

9  A.        Yep.

10 Q.        And where did you -- When did you obtain

11 that rather?  Excuse me.

12 A.        2007 I want to say.

13 Q.        I don't mean this pejoratively.  When did

14 you drop out of high school?

15 A.        2007.

16 Q.        And was that your senior year?

17 A.        Yes.

18 Q.        Which high school did you go to?

19 A.        Groveport.

20 Q.        So you were a Cruiser?

21 A.        Yes.

22 Q.        What were the circumstances that led you

23 to leave high school your senior year?

24 A.        I had my first daughter.

Kaitlyn Porter
4/26/2022

1   Q.          So the pregnancy and all that entailed

2   taking care of a newborn, you decided at that point

3   to put your education on hold and then go back and

4   get your GED, fair?

5   A.          Not necessarily.  I chose a different path

6   for my education, one that worked in a way that would

7   work with the family that I had.

8   Q.          Well, at that time, since you and Patrick

9   did not get married until 2011, was Patrick living

10  with you and helping take care of the baby from 2007

11  to 2011?

12  A.          No.

13  Q.          For lack of a better term, you were a

14  single mom --

15  A.          Yes.

16  Q.          -- during that period?

17  A.          Yes.

18  Q.          And at that point, were you also living at

19  home on Westfall in Lancaster with Kathy?

20  A.          No.  I had my own apartment.

21  Q.          So that's a handful if you don't mind me

22  saying so.  So you have a newborn and you're working

23  and you have your own place?

24  A.          Yes.

```
 1    Q.         What sorts of work were you doing in 2007?

 2    A.         I went in between property management and

 3    warehouse work.

 4    Q.         We'll explore this a little bit more.  I

 5    want to go back to education then.  So you got your

 6    GED in 2007, but that would be the same year that you

 7    graduated --

 8    A.         Uh-huh.

 9    Q.         -- you would have graduated, had you

10    graduated?

11    A.         Yes.

12    Q.         And after you got your GED, describe your

13    education for me.

14    A.         I went to trade school to be an STNA.

15    Once I received my certification, I started looking

16    into college while I was working as an STNA.

17    Q.         Where did -- Which trade school did you go

18    to to get your STNA certification or licensure?

19    A.         Eastland-Fairfield Career Center.

20    Q.         Did you work -- was it for Visiting

21    Angels?

22    A.         Yes.

23    Q.         Did you work for anyone else as a nurse

24    aide?
```

```
 1    A.          I worked privately.

 2    Q.          When did you obtain your nurse aide

 3    licensure?  I think you indicated earlier.  My

 4    apologies.  Was that 2004?

 5    A.          No.  I think it was 2011 or '9, one of the

 6    two.

 7    Q.          When was your next educational opportunity

 8    or path after that, Kaitlyn?

 9    A.          I enrolled in a college full time in 2011

10    and obtained my associate's in 2014.

11    Q.          So in 2011 to 2014, got your associate's.

12    I'm assuming you were working full time as well?

13    A.          Yes.

14    Q.          What was your course of study?

15    A.          Criminology.

16    Q.          Were you interested in a career in law

17    enforcement or law or --

18    A.          It was my prerequisites for pre law.

19    Q.          And where did you get your criminology?

20    A.          Kaplan University.

21    Q.          Kaplan?

22    A.          Uh-huh.

23    Q.          Is that a yes?

24    A.          Yes.
```

1   Q.          I'm unfamiliar with Kaplan.  Is that an

2   online, or is that --

3   A.          They do have brick and mortar schools, but

4   they are online as well.

5   Q.          How did you participate or attend school

6   during the period of 2011 to 2014?

7   A.          I went to their brick and mortar location

8   in Columbus until it closed on my last quarter, so I

9   actually obtained the degree last quarter online.

10  Q.          Any further education after your degree

11  from Kaplan?

12  A.          Yes.  I am currently working on my

13  bachelor's at Franklin University.

14  Q.          Franklin?

15  A.          Uh-huh.

16  Q.          Is that a yes?

17  A.          Yes.

18  Q.          When did you start at Franklin?

19  A.          I've been on and off since 2013.

20  Q.          And how far -- What are you studying to

21  get your bachelor's?

22  A.          I'm currently getting a bachelor's in

23  business management.

24  Q.          Has that always been the case?  Sometimes

1    people switch majors.  Have you switched majors since

2    starting Franklin in 2013?

3    A.        No.

4    Q.        And how far away are you from obtaining

5    your bachelor's today, Kaitlyn?

6    A.        I think I'm about six classes away.

7    Q.        Are you on quarters or semesters?

8    A.        Quarters.

9    Q.        So maybe a couple quarters, right?

10   A.        Yeah.

11   Q.        So STNA.  Then you got your associate's.

12   You're working on your bachelor's.  Have we discussed

13   all your educational opportunities or colleges that

14   you've been in?

15   A.        Yes.

16   Q.        I want to talk about employment.  Where

17   are you currently employed?

18   A.        I'm actually on maternity leave right now.

19   Q.        Okay.  Are you pregnant right now, or did

20   you just deliver?

21   A.        I just delivered.  I had a baby 20 days

22   ago.

23   Q.        My apologies, because I heard Camberly and

24   Kassidy, and I didn't hear the last.  So my

1    apologies.  How old is your son or daughter?

2    A.          It's a daughter.  She's 20 days.

3    Q.          Well, congratulations.

4    A.          Thank you.

5    Q.          Who is your employer?

6    A.          It would be Integra Affordable.

7    Q.          What do you do there?

8    A.          Property management.

9    Q.          And where is Integra Affordable located?

10   Where are they headquartered?

11   A.          They're an investor firm, so I work with

12   the New Jersey headquarters; but I believe they're

13   based out of California.

14   Q.          And which location do you manage?

15   A.          The Latitude Five25 building.

16   Q.          That's here in Columbus.  I think I've

17   seen it.

18   A.          Yes.

19   Q.          Is it on Long Street?

20   A.          Sawyer Boulevard.

21   Q.          Is that west -- coming west out of

22   downtown?

23   A.          Yes.

24   Q.          How long have you been working at Integra

```
 1    Affordable?

 2    A.          Since August 16 of last year.

 3    Q.          Any other positions that you've held since

 4    August 16 of last year until today?

 5    A.          No.

 6    Q.          Between the time of your termination from

 7    Two Guys and a Calculator and the beginning of your

 8    position at Integra Affordable, did you hold any

 9    jobs?

10    A.          No.

11    Q.          Who is your supervisor at Integra

12    Affordable?

13    A.          Motty.

14    Q.          Can you spell that?

15    A.          M-O-T-T-Y.

16    Q.          And what is Motty's last name?

17    A.          I'm not sure, to be honest.

18    Q.          Is it a male or a female?

19    A.          It's a male.

20    Q.          And in terms of the tasks and duties that

21    you have to do property management for the Latitude

22    Five25 building on Sawyer Boulevard, who else works

23    with you, other than perhaps Motty, to manage that

24    property?
```

1    A.          Currently nobody.  I have maintenance

2    staff.

3    Q.          So is HR handled out of New Jersey or

4    California for the property management that's being

5    done for the Latitude Five25 building?

6    A.          I actually think those folks work from

7    home.  I don't think they work out of any of the

8    buildings, but I'm not sure.  I always hear them at

9    home though when I call, so I think they work from

10   home.

11   Q.          Everyone is working from home nowadays.

12   How did you find out about this property management

13   position at Integra Affordable?

14   A.          I applied through Indeed.

15   Q.          And is that the type of work that you were

16   looking for when you obtained this position, property

17   management?

18   A.          Yes.

19   Q.          Since leaving -- Strike that.

20               Since your separation from Two Guys and a

21   Calculator, Kaitlyn, have you sought any positions

22   with tax preparation outfits like Liberty Tax?

23   A.          Immediately after being discharged, I had

24   applied for a different location in a different city

1    but ultimately decided that I didn't want to do it;

2    so I went back to property management, which is what

3    I was doing before.

4    Q.        What city were you interested in -- what

5    city were you seeking to be employed at at Liberty

6    Tax?

7    A.        Where I was living, at Lancaster.

8    Q.        And why was it exactly that you didn't

9    pursue that?

10   A.        My experience wasn't very good with it.

11   Q.        Okay.  With -- You're talking about with

12   your former employment, or you didn't think it was

13   going to be good with your possible employment in

14   Lancaster?

15   A.        Just with the previous employment

16   experience.

17   Q.        Did you actually interview for a position

18   with Liberty Tax's franchises in Lancaster?

19   A.        I think I spoke to somebody over the

20   phone, but ultimately chose not to do an interview.

21   Q.        So I'm going to work backwards from your

22   position at Latitude Five25.

23   A.        Sure.

24   Q.        So we know two pieces of that which is

1  Latitude Five25.  Then I'll just call it Liberty Tax

2  or Two Guys and a Calculator.  During your employment

3  at Two Guys and a Calculator, did you have other

4  positions that you were working?

5  A.          No.

6  Q.          Prior to Two Guys, what was your

7  employment?  What was the position and company that

8  you held immediately prior to Two Guys?

9  A.          I don't quite remember.  But I know I was

10  working at -- I was a property manager, and I had

11  worked very briefly for Advanced Auto in between.

12  And I'm not sure which one was right before.

13  Q.          I saw Pep Boys.  Is that the same thing as

14  Advanced Auto, or is that a different --

15  A.          Yeah.  It's auto parts.  They own it.

16  Q.          So Pep Boys and Advanced Auto are the same

17  thing?

18  A.          Yes.

19  Q.          So for Advanced Auto or Pep Boys, what did

20  you do for them?

21  A.          I was an inventory manager.

22  Q.          At which location?

23  A.          Harrisburg.

24  Q.          And can you give me the approximate dates

```
 1    that you were working at Pep Boys?

 2    A.          I don't remember it, honestly.  It was

 3    very brief.

 4    Q.          Okay.  Do you remember what year it was?

 5    A.          It would have been right before Liberty,

 6    so a year before.

 7    Q.          Give me a second.

 8                MR. HERSHBERGER:  Off the record.

 9          (Discussion held off the record.)

10                MR. HERSHBERGER:  Back on the record.

11   BY MR. HERSHBERGER:

12    Q.          You had indicated that you were employed

13    briefly at Pep Boys.  Do you have an idea as to how

14    many days, weeks or months you worked there?

15    A.          I don't remember.

16    Q.          What were the circumstances surrounding

17    your separation from Pep Boys?

18    A.          What do you mean?

19    Q.          Were you fired?

20    A.          No.

21    Q.          Did you quit?

22    A.          No.  So I was hired to be a

23    driver/manager.  I would have, in between managing

24    the inventory for parts, drove parts between
```

```
 1    locations.  This would require me to have, per the

 2    company, a specific requirement in my license.  That

 3    was not revealed to me in the interview, so me and

 4    management decided that we would ultimately part

 5    ways, as I was not able to make those runs, as I

 6    didn't have the license needed.

 7    Q.        So these duties that you're describing to

 8    me now are part of your duties as an inventory

 9    manager for Pep Boys?

10    A.        Right.

11    Q.        Kaitlyn, do you think you worked there

12    more than six months?

13    A.        I don't think so.  I can't remember.

14    Q.        I mean, what you're describing to me

15    sounds like you may have been technically driving

16    illegally because you didn't have a certain

17    endorsement on your license and you didn't know it.

18    A.        No.  I wasn't driving for them.

19    Q.        But they wanted you to?

20    A.        Correct.

21    Q.        So is this an added job function in

22    addition to the other things that you were doing that

23    caused you not to be able to perform the full duties

24    of the job?
```

1    A.          Correct.

2    Q.          And were there people similarly situated

3    to you, Kaitlyn, other than inventory managers at

4    other stores that also had this requirement imposed

5    upon them?

6    A.          Yes.

7    Q.          And what sort of licensure did you need to

8    obtain to be able to keep and perform -- keep on as

9    your position as inventory manager?

10   A.          I can't even remember what the

11   requirements were.

12   Q.          Did you need a commercial driver's

13   license?

14   A.          I can't remember what the requirements

15   were.

16   Q.          Did they -- Did the folks at management at

17   Pep Boys or Advanced Auto offer to train you?

18   A.          Yes.

19   Q.          Did they offer to pay for that training?

20   A.          No.

21   Q.          And do you know whether that training

22   entailed any sort of cost?

23   A.          I'm not sure.

24   Q.          What's your understanding as to how long

1    the training would have taken?

2    A.          I'm not sure.

3    Q.          Okay.  Is it the case, Kaitlyn, that you

4    simply didn't prefer to drive for Pep Boys?

5    A.          No.

6    Q.          And I'm trying to understand why you and

7    the company would have parted ways at that time if

8    they were adding a job requirement for you.

9    A.          Simply put, it would have put me in

10   between paychecks.  And at the time my lifestyle did

11   not provide me the ability to go in between

12   paychecks, so I had to find another job that would

13   allow me to stay on payroll full time.

14   Q.          While you were working for Pep Boys, were

15   you holding down another job as well?

16   A.          No.

17   Q.          Prior to this position at Pep Boys, which

18   was your employment immediately prior to Two Guys and

19   a Calculator, where did you work?

20   A.          I was a property manager.

21   Q.          Who were you a property manager for?

22   A.          Big Guy Properties.

23   Q.          And how long were you a property manager

24   for Big Guy Properties?

```
 1    A.         I can't remember the time frame.  I'm

 2    going to say close to a year, maybe a little more.

 3    Q.         And which property did you manage for Big

 4    Guy's?

 5    A.         I had three locations.  I ran Canonby

 6    Place out west, Evergreen Apartments, which was also

 7    out west and Kingdom Manor, which was up north.

 8    Q.         During this one year that you worked as a

 9    property manager for Big Guy's, were you employed

10    elsewhere?

11    A.         No.

12    Q.         Can you describe the reasons for your

13    separation from your employment at Big Guy's.

14    A.         The pandemic.

15    Q.         So I want to make sure I understand the

16    time frames.  Prior to Two Guys, then there was Pep

17    Boys.  Prior to Pep Boys, there was Big Guy's, right?

18    A.         Yes.

19    Q.         And you separated from Big Guy's prior to

20    beginning your employment at Pep Boys, right?

21    A.         Yes.

22    Q.         And the reason for that separation was the

23    pandemic?

24    A.         Yes.
```

```
 1    Q.          And what was it about the pandemic,

 2    Kaitlyn, that caused that separation?

 3    A.          They let go the whole staff.  They closed

 4    the office essentially, so -- and then shortly

 5    thereafter sold the company.

 6    Q.          So they were left without a property

 7    manager for all of those three properties that you

 8    were managing?

 9    A.          Correct.

10    Q.          Do you know how they collected rents?

11    A.          They always used, like, a collection box

12    system; and the manager would just go collect that

13    out of the boxes.

14    Q.          Prior to Big Guy's and in the year or so

15    that you were there, where did you work?

16    A.          I think I was a manager for Family Dollar,

17    but I can't remember what I did directly before that.

18    Q.          How long were you the manager for Family

19    Dollar?

20    A.          I don't remember.

21    Q.          Less than a year?

22    A.          Probably about around a year maybe.

23    Q.          Was this full-time work?

24    A.          Yes.
```

```
 1    Q.          Similarly, was Big Guy's full-time work?
 2    A.          Yes.
 3    Q.          Similarly, was Pep Boys or Advanced Auto
 4    full-time work?
 5    A.          Yes.
 6    Q.          I sometimes get Family Dollar and Dollar
 7    General mixed up.  I've seen some references in some
 8    records that I've looked at to Dollar General.
 9    A.          I worked at both.
10    Q.          Okay.
11    A.          I was a manager for both.
12    Q.          Does -- Did Family Dollar sell liquor at
13    the time that you were working for them?
14    A.          Family Dollar, yes.  No.  No.  They
15    weren't.
16    Q.          Which location of Family Dollar did you
17    work at?
18    A.          The Central Point Plaza location.
19    Q.          Is that in Columbus or Lancaster?
20    A.          Columbus.
21    Q.          Full-time work?
22    A.          Yes.
23    Q.          Were you the manager or the assistant
24    manager there?
```

```
 1    A.          At which place?

 2    Q.          At Family Dollar.

 3    A.          Family Dollar I was the assistant manager.

 4    Q.          And what were the circumstances

 5    surrounding your separation from Family Dollar?

 6    A.          I got an opportunity to work for Big Guy

 7    Properties.

 8    Q.          Resigned?

 9    A.          Yes.

10    Q.          Did you provide notice?

11    A.          Yes.

12    Q.          And did you work out the term of your

13    notice?

14    A.          I worked with half of it.

15    Q.          During the time that you were employed at

16    Family Dollar, did you have other employment during

17    that time?

18    A.          No.

19    Q.          Prior to Family Dollar, where did you

20    work?

21    A.          I don't remember.

22    Q.          Do you remember the last employer that you

23    had before Family Dollar?

24    A.          I think it was Dollar General.
```

Kaitlyn Porter
4/26/2022

1  Q.        And which location at Dollar General?

2  A.        I worked at a few.  The last one I worked

3  at was James and Broad.

4  Q.        What was your position for -- with Family

5  Dollar -- or Dollar General?

6  A.        I was the manager.

7  Q.        And you would have managed different

8  stores as they needed you?

9  A.        Somewhat.  They were restructuring about

10  the time I left, and they were trying to get

11  established managers to go to the new locations that

12  they were restructuring to kind of put them together

13  for them.

14  Q.        How did you hear about Family Dollar?

15  A.        One of the people I used to work with at

16  Dollar General went to Family Dollar.

17  Q.        And I think your testimony was that you

18  worked at Dollar General before Family Dollar, true?

19  A.        Yes.

20  Q.        I know approximately six months, maybe a

21  year at Family Dollar.  Do you have a ballpark

22  estimate?

23  A.        About that.

24  Q.        Full time?

Kaitlyn Porter
4/26/2022

```
 1    A.          Yes.

 2    Q.          And what were the reasons for your

 3    separation from Family Dollar?

 4    A.          I got an opportunity to work for Big Guy

 5    Properties.

 6    Q.          Did you work for Big Guy Properties on

 7    more than one occasion?

 8    A.          No.

 9    Q.          While you worked at Dollar General, did

10    you have any other employment?

11    A.          Yes.  Here and there.  I don't remember it

12    though because I worked there for quite sometime,

13    almost four years.

14    Q.          You worked at --

15    A.          Dollar General.

16    Q.          -- Dollar General for about four years?

17    A.          Yes.

18    Q.          Did you ever work for Rue 21?

19    A.          Briefly, yes.

20    Q.          Did you ever work for Ryder?

21    A.          Briefly, yes.

22    Q.          Do you remember about when you worked for

23    Ryder?

24    A.          No.
```

1    Q.          Do you remember which location you worked

2    at?

3    A.          It was Groveport London Road.  That would

4    be, I think, Groveport, Columbus.

5    Q.          What did you do at Ryder?

6    A.          It was an inventory manager.

7    Q.          Was that similar to what you were doing at

8    Pep Boys?

9    A.          Yes.

10   Q.          And how long do you think you were at

11   Ryder?

12   A.          I can't remember.  That was a very long

13   time ago.

14   Q.          Less than a month?

15   A.          I don't know.

16   Q.          What were the circumstances surrounding

17   your separation from Ryder?

18   A.          I don't remember.  It was a very long time

19   ago.

20   Q.          Were you fired?

21   A.          I don't remember.  It was a very long time

22   ago.

23   Q.          Did you work for Public Storage?

24   A.          Yes.

1    Q.        Which location?

2    A.        I worked at a few.  Hamilton Road, both

3    locations.  The one off Kinnear, a couple others.

4    Q.        How long did you work for Public Storage?

5    A.        I don't remember.  It was over a year.

6    Q.        And what did you do for them?

7    A.        I was a property manager.

8    Q.        Full time?

9    A.        Yes.

10   Q.        When you were working for Public Storage,

11   did you have other employment?

12   A.        I can't remember.

13   Q.        And do you remember the circumstances in

14   which you severed employment or ties with Public

15   Storage?

16   A.        No.

17   Q.        Do you recall if you were fired or quit?

18   A.        No.

19   Q.        Did you work for Little Caesars?

20   A.        Yes.

21   Q.        When did you work for Little Caesars?

22   A.        I don't remember.  It was very briefly.

23   Q.        Briefly, less than two months?

24   A.        I would assume.  I don't remember.

Kaitlyn Porter
4/26/2022

50

```
 1    Q.        What did you do at Little Caesars?

 2    A.        I was the manager.

 3    Q.        For which store?

 4    A.        The South High Street location.

 5    Q.        I'll take your word that there's probably

 6    only one.

 7    A.        Yeah.

 8    Q.        I don't know.  Is that location still

 9    around?

10    A.        Yes.

11    Q.        During your employment for Little Caesars

12    for these couple months or so, do you remember

13    whether you were working anywhere else?

14    A.        I don't think so.

15    Q.        Do you remember the circumstances

16    surrounding your separation from Little Caesars?

17    A.        Ultimately, I don't think the environment

18    was for me.

19    Q.        Can you expound upon that?

20    A.        I believe at the time that I was in

21    school; and it was physically demanding, so it was

22    hard to manage both.

23    Q.        Let's start maybe with this.  I don't know

24    which one this is.  I got some of these premarked.
```

1    So let's start with F.

2                        - - -

3            And, thereupon, Defendant's Exhibit F was

4    marked for purposes of identification.

5                        - - -

6    BY MR. HERSHBERGER:

7    Q.          Kaitlyn, I'm handing you what's been

8    marked as Defendant's Exhibit F.  This is part of

9    some subpoenaed information I received concerning

10   some employment that you had with -- it says:  PRP

11   Employment Application.  But I think this was also

12   known as Fusion Employer Services.  Does this ring a

13   bell at all to you?

14   A.          I briefly worked here.

15   Q.          Okay.  What did you do for Fusion?

16   A.          Quality inspections.

17   Q.          For how long?

18   A.          Not very long.  Maybe two weeks.

19   Q.          And why did you work there only two weeks?

20   A.          The manager wasn't paying out hours that

21   we worked, so overtime wasn't getting paid.

22   Q.          Can you confirm for me that the first one,

23   two, three, four -- Well, let's look at this.  Page 1

24   of Exhibit F, is that information that you provided

1   to Fusion Services or PRP for your position?

2   A.          I'm sorry.  I don't understand your

3   question.

4   Q.          Looking at the information on Page 1 of

5   Exhibit F, is that information you provided to PRP

6   Employment or to Fusion related to applying for

7   employment there?

8   A.          Are you asking me is it accurate --

9   Q.          I'm asking you --

10  A.          -- or if I provided it?

11  Q.          If that's what you provided.

12  A.          Yes.

13  Q.          Same thing with regards to Page 2.  Is

14  that the information that you provided?

15  A.          Yes.

16  Q.          And this would have been on March 19,

17  2019, if I'm looking at the date in the upper

18  right-hand corner.  Does that ring a bell?

19  A.          3/19/19?

20  Q.          Yes.

21  A.          Sure.

22  Q.          Okay.  And then with regards to Page 3,

23  there's some handwriting on there as -- Is that your

24  handwriting?

1    A.        Yes.

2    Q.        And then turn to Page 5.  It looks like

3    there's some initials there on Page 5 of this

4    exhibit.

5    A.        Uh-huh.

6    Q.        Are those your initials?

7    A.        Yes.

8    Q.        Okay.  And then if you could turn to

9    Page 6.  Are those your initials?

10   A.        Yes.

11   Q.        Okay.  And then Page 7 there's a

12   signature.  Is that your signature?

13   A.        Yes.

14   Q.        And then on Page 8 -- I don't know that

15   it's actually numbered, Kaitlyn, but it's the last

16   page of this exhibit.  It's -- It appears to be your

17   W-2 form for 2019 from Fusion Employer Services.  It

18   looks like you made about $200 or so.  Does that

19   comport with your understanding as to about how long

20   you worked there based on the hourly pay that you

21   were getting?

22   A.        My pay was not received completely.

23   Q.        Did you end up filing any sort of

24   grievance or charge against Fusion Employer Services

1    because of their pay practices?

2    A.          I filed a complaint through the company

3    itself as well as HR.

4    Q.          And was that resolved?

5    A.          No.

6    Q.          As a result of it not being resolved, did

7    you take any further steps?

8    A.          Financially it wouldn't make sense to.  I

9    would have paid more than I would have received back

10   in my check.

11   Q.          Do you remember about how much per hour

12   you were getting paid at Fusion?

13   A.          No.  Maybe 17 I think.  I can't remember.

14   Q.          $17 an hour.  You don't remember though?

15   A.          No.

16   Q.          If I -- And I kind of do the gross math.

17   If I divide 17 into 258, I'm coming up with something

18   less than 20 hours.  Do you think you worked more

19   than 40 hours for Fusion?

20   A.          Yes.

21   Q.          Do you think you worked more than 100

22   hours for them?

23   A.          No.

24   Q.          Set that aside for the court reporter.

```
 1                        - - -
 2              And, thereupon, Defendant's Exhibit G was
 3     marked for purposes of identification.
 4                        - - -
 5     BY MR. HERSHBERGER:
 6     Q.         This is going to be G.  I'm handing you
 7     what's been marked as Exhibit G, Kaitlyn.  Similarly,
 8     this is information that I got with the aid of a
 9     records subpoena.  It looks like this one went
10     to -- give me a second -- Rue 21?
11     A.         Uh-huh.
12     Q.         Do you remember working for Rue 21?
13     A.         Not really.  But, yes, I remember working
14     for them.
15     Q.         The date of this application on Page 1 is
16     April 30, 2019, if I've got this right.  Do you see
17     where I am?
18     A.         Right here?
19     Q.         Correct.
20     A.         Uh-huh.
21     Q.         Okay.  Did you provide that information on
22     Page 1 on that date?
23     A.         I can't remember.
24     Q.         Can you think of anyone else who would
```

1    have provided that information other than you if you

2    actually were employed there?

3    A.          No.  I mean, I was employed there so I

4    would assume, but I can't remember the dates.

5    Q.          Looking at Page 2 of Exhibit G, it talks

6    about you're applying for a store manager position at

7    Rue 21.  Did you work there as a store manager for

8    Rue 21?

9    A.          I did.

10   Q.          And it asked if you were able to work

11   overtime, and you indicated yes.  Do you remember

12   that?

13   A.          Yes.

14   Q.          With regards to Page 2, did you provide

15   that information on Page 2 as part of your

16   application to Rue 21?

17   A.          Yes.

18   Q.          Same question with regards to Page 3.  Did

19   you provide that information to Rue 21 as part of

20   your application?

21   A.          Yes.  I can see that they have me as

22   graduated though, and I'm not.  So it may not be

23   accurate.

24   Q.          The information that's there is the

1  information you provided?

2  A.          I don't know.  I don't remember.  I

3  wouldn't have provided that I was graduated because

4  I'm not.  So maybe it was over the Internet, and

5  things prefilled from --

6  Q.          Is that your testimony though?  You were

7  filling out this application over the Internet?

8  A.          Yes.

9  Q.          Then with regards to Page 4, that

10  information on that page, is that what you provided

11  as part of your application to Rue 21?

12  A.          Yeah.

13  Q.          Turn to Page 5.  Is that part of the

14  information that you provided to Rue 21 as part of

15  your application?

16  A.          This isn't provided information.  It's

17  just description of a job.

18  Q.          Well, you provided that to Rue 21.  They

19  didn't fill it in themselves, fair?

20  A.          No.

21  Q.          It's not fair?

22  A.          I don't make the scope of their position.

23  I wouldn't have told myself what the position

24  required, so, no.

1    Q.        What I'm talking about is:  If we look at

2    Page 5, it talks about employment at Little Caesars

3    in the middle of the page.  Do you see that?

4    A.        No.

5    Q.        No?  You don't see it?

6    A.        Is this the page you're on?

7    Q.        Bear with me.  Yeah.  I just can't read

8    upside down.  My apologies.  Right here.  So pointing

9    to where it says Little Caesars on that page.  So now

10   they're kind of signposted there.  Do you see where

11   I'm referring?

12   A.        Yes.

13   Q.        And then there's a description of the job.

14   A.        Yes.

15   Q.        Is that the description that you provided

16   to Rue 21 of your duties at Little Caesars?

17   A.        Yes.

18   Q.        Turn the page to Page 6.  Similarly, is

19   the information on that page information that you

20   provided to Rue 21 as part of this application?

21   A.        Yes.

22   Q.        Turn the page to Page 7.  Same question,

23   Kaitlyn.  Is this information that you provided to

24   Rue 21 as part of your application?

1   A.          Yes.

2   Q.          Turn the page to Page 8.  There's a couple

3   of references there, and one is Robert Davis.  And

4   I've seen this name come up in some others.  So I

5   didn't know -- Who is Bob Davis to you?  Is he

6   related to you at all?

7   A.          No.  He's my former manager.

8   Q.          At which location or which employment?

9   A.          Dollar General.

10  Q.          And Cameo Keith, is that a relation to

11  Shaniqua?

12  A.          Yes, that is.

13  Q.          Is that the same person, or is that --

14  A.          Yeah.  It's her.  I don't know why it came

15  out this way.

16  Q.          So Cameo Keith is actually Shaniqua Keith?

17  A.          Yes.  That's her middle name.

18  Q.          And that phone number that appears on this

19  page of this application for Rue 21 is or was at

20  least Shaniqua's at the time?

21  A.          Yes.

22  Q.          And if we can turn the page.  I don't know

23  that you can verify this or not.  But I think you

24  said your tenure there was relatively brief.

Kaitlyn Porter
4/26/2022

```
1   A.          Yes.

2   Q.          It looks like they have payroll for you

3   from May 8, 2019, to June 10, 2019.  Does that

4   comport with your recollection of the approximate

5   dates that you worked -- or the period that you

6   worked at Rue 21 or for Rue 21, true?

7   A.          I would assume, yes.  I don't quite

8   remember off the top of my head.  But it looks about

9   right.

10  Q.          Were you paid all the monies that you were

11  owed during your employment at Rue?

12  A.          I believe so, yes.

13              MR. HERSHBERGER:  And Rue is R-U-E.

14  BY MR. HERSHBERGER:

15  Q.          You can turn a couple pages to Rue crew

16  timecard.  And there's some things that says

17  "exceptions" down at the bottom of the page.

18  A.          Okay.

19  Q.          I don't work for them.  I tried to make

20  this out, and it looks like these were their

21  estimations of times that maybe you clocked in early

22  or left early.  Did that happen for you during your

23  employment at Rue 21?

24  A.          What are you asking?
```

1    Q.          I'm asking whether you ever clocked in

2    early.  Did you ever clock in late during your

3    employment at Rue 21?

4    A.          I wouldn't remember.

5    Q.          Do you remember ever leaving early?

6    A.          I wouldn't remember.

7    Q.          Do you ever remember missing a shift?

8    A.          I wouldn't remember.

9    Q.          If I end up taking the depositions of

10   folks from Rue and they confirm that this data down

11   here at the bottom of the page underneath

12   "exceptions" indicates instances where you may have

13   clocked out early or missed a shift or worked with an

14   unscheduled shift or not shown up for a shift that

15   you were scheduled for, would you have any reason to

16   debate that?

17                MS. BREEDLOVE:  Objection.  Speculation.

18                You can answer.

19   A.          Absolutely.  This doesn't really tell you

20   whether or not I came in to cover a shift or leave

21   early for them or not.  This just states that I did

22   or didn't, which doesn't tell you why.

23                                - - -

24                And, thereupon, Defendant's Exhibit H was

Kaitlyn Porter
4/26/2022

```
 1    marked for purposes of identification.

 2                        - - -

 3  BY MR. HERSHBERGER:

 4    Q.        Kaitlyn, I'm handing you what's been

 5    marked as Exhibit H.  This is a personnel action form

 6    from 3166, Inc., which I believe is the Burger King

 7    franchise.  Do you remember working for Burger King?

 8    A.        Yes.

 9    Q.        How long did you work for Burger King?

10    A.        Not very long.

11    Q.        It looks like maybe two weeks.  Does that

12    sound about right?

13    A.        Yep.

14    Q.        Have you seen this document before?

15    A.        No.

16    Q.        I'm going to ask you to take a look at

17    least Page 1 of it.  And let me know when you're

18    done.

19    A.        Okay.

20    Q.        Were you terminated from Burger King?

21    A.        No.

22    Q.        Did you quit?

23    A.        Yes.

24    Q.        If you see where it says question one on
```

1    the personnel action form, let me know when you're

2    there.

3    A.         Yes.

4    Q.         And it asked to describe the events

5    leading up to termination with specificity.  And

6    what's written in bold by someone was:  "On July 4,

7    Kaitlyn indicated that she was quitting."  Does that

8    comport with your recollection?

9    A.         I don't remember the date, but, yes, I

10   quit.

11   Q.         And what was the reason for you quitting?

12   A.         Overall management.  They weren't properly

13   putting us into the system as far as our hours go.

14   So they would put, like, two people on a shift that

15   really needed four or five people, which really

16   stressed out the two people that were there.  On top

17   of that, management was not professional.

18   Q.         How were they not professional?

19   A.         The manager that I was directly underneath

20   was using drugs on the shift.  So --

21   Q.         What kind of drugs?

22   A.         I'm not entirely sure what she was doing,

23   to be honest.  I don't --

24   Q.         Kaitlyn, I'm asking because if they were

1    doing drugs, you either personally witnessed that or

2    someone told you that they were using or the person

3    admitted, right?

4              MS. BREEDLOVE:  Objection.

5    BY MR. HERSHBERGER:

6    Q.        So I'm trying to figure out the basis for

7    your knowledge.

8    A.        Either way, I quit because it was not a

9    good environment for me.

10   Q.        And I'm turning back to the question that

11   I asked.  Did this person that you thought was using

12   drugs, did they admit to using drugs on the job?

13   A.        I don't remember.

14   Q.        Did someone else tell you that this person

15   was using drugs?

16   A.        I don't remember.

17   Q.        Did you observe this person

18   observing drugs -- or using drugs?

19   A.        Yes.

20   Q.        And what drugs did you observe this person

21   using?

22   A.        I don't know.

23   Q.        Were they taking pills?

24   A.        No.

1    Q.          Were they smoking anything?

2    A.          Yes.

3    Q.          Okay.  Were they smoking crack or

4    marijuana?

5    A.          I don't know.

6    Q.          Do you know what it is that they were

7    smoking?

8    A.          No.

9    Q.          So you know that it was a drug?

10   A.          I felt that way, yes.

11   Q.          Why?

12   A.          Because they were impaired afterwards.

13   Q.          In what way?

14   A.          In the impaired way.

15   Q.          Were they -- Was their speech slurred?

16              MS. BREEDLOVE:  Objection.  What is the

17   relevance?

18              MR. HERSHBERGER:  She's got a retaliation

19   claim here.  It will tie in.

20   BY MR. HERSHBERGER:

21   Q.          Did you report -- As a result of this

22   concern about management being under drugs to the

23   point that you're going to quit, did you report this

24   concern up the management chain?

Kaitlyn Porter
4/26/2022

```
1    A.          Yes.  I did to the regional.

2    Q.          And did you get any resolution?

3    A.          No.  That's why I left.

4    Q.          Was this person that you thought was under

5    the influence of drugs or had taken drugs a comanager

6    with you or someone above you?

7    A.          I don't know how they would classify it.

8    We worked together as managers, but I don't know if

9    she was above me or not.  I wasn't there long enough

10   to --

11   Q.          You didn't have the power to fire this

12   person?

13   A.          No.

14   Q.          And you didn't hire them?

15   A.          No.

16   Q.          All right.  We're done with H.

17                           - - -

18               And, thereupon, Defendant's Exhibit I was

19   marked for purposes of identification.

20                           - - -

21   BY MR. HERSHBERGER:

22   Q.          Kaitlyn, handing you what's been marked as

23   Exhibit I.  I sent out a records subpoena to Anchor

24   Security and Logistics and received some documents
```

```
 1     that you have in front of you.  Have you seen these
 2     documents before?
 3     A.          Yes.
 4     Q.          Is the handwriting that's on Page 1 of
 5     Exhibit I yours with the exception of the stuff at
 6     the bottom?
 7     A.          Yes.
 8     Q.          Did you end up getting $12 an hour to
 9     start there?
10     A.          No.
11     Q.          What did you get?
12     A.          They were supposed to pay me that and
13     didn't pay me.
14     Q.          What did they pay you?
15     A.          Nothing.
16     Q.          How long did you work for Anchor Security
17     and Logistics?
18     A.          I want to say less than two weeks.
19     Q.          Turning your attention to Page 2.  Is that
20     all in your handwriting as well?
21     A.          No.
22     Q.          Okay.
23     A.          Wait.  This is Page 2.
24                 MR. HERSHBERGER:  My apologies.  Oh,
```

```
 1    man.  So this is a hang up.  My apologies.  Off the
 2    record.
 3              (Discussion held off the record.)
 4                MR. HERSHBERGER:  Back on the record.
 5                        - - -
 6              And, thereupon, Defendant's Exhibit I-2
 7    was marked for purposes of identification.
 8                        - - -
 9
10    BY MR. HERSHBERGER:
11    Q.         Kaitlyn, my apologies.  So I think the
12    best way to clear up this record is:  I'm going to
13    take Exhibit I, and it's going to go right in the
14    trashcan.  And I'm going to restart your examination
15    using what's in front of you as Exhibit I-2 because
16    we didn't -- we weren't on the same page.  And I
17    don't think that we covered too much ground.
18              And I think the questions were this:  With
19    regards to Exhibit I-2 that's in front of you, can
20    you confirm that all of the handwriting that's on
21    Page 1 with the exception of the stuff at the bottom
22    that begins with the words "open" and then it says:
23    "trans," I think it stands for transportation, "yes,"
24    "smart, yes" and "below," that's in your handwriting,
```

1    correct?

2    A.          Everything, yes.

3    Q.          And then with regards to Page 2 which we

4    now have the same Page 2, all the information on that

5    page and your signature is your handwriting, correct?

6    A.          Correct.

7    Q.          And then attached to that is the resumé

8    that you provided to Anchor Security and Logistics,

9    correct?

10   A.          Correct.

11   Q.          You can set that aside.  Kaitlyn, can you

12   think of anyone that in your mind went through what

13   you went through during your employment at Two Guys

14   in terms of being moved around to a different

15   location?

16   A.          Yes.

17   Q.          Can you give me those person's names?

18   A.          I didn't know a lot of people's names.

19   But there was an African gentleman that had been

20   swapping locations at the time that ended up

21   somewhere else before he ended up at West Gate right

22   before I left as well.  I don't know where he ended

23   up after that.  But he had been moved around a little

24   bit.

```
1   Q.         And did you have an understanding from
2   talking with this African gentleman why they were
3   moving him around or why he was being moved around?
4   A.         He actually was very confused about the
5   process as well.  He was just coming out of tax
6   school as a tax preparer and was supposed to be
7   shadowing at the location and was very unaware of
8   really what was coming next or what he was doing.
9   Q.         Okay.  Do you remember -- I want to go
10  back to Reynoldsburg and the day that you were there
11  shadowing the gentleman.  I think you said he used to
12  be the owner there.
13  A.         Uh-huh.
14  Q.         Do you remember any interactions that you
15  had with this gentleman at all?
16  A.         Sure.  It was only for the day.
17  Q.         What sorts of things do you remember
18  happening?
19  A.         We chatted about the location, about how
20  he kept his back office, where he kept things.
21  Q.         Okay.  Anything else that you can recall?
22  A.         Not necessarily, nothing out of the
23  ordinary, small talk.
24  Q.         Fair enough.  And I kind of signpost that
```

1    because I think in your prior testimony you had

2    concerns at a prior employment about the

3    professionalism of the team around you and the

4    management, et cetera.

5              With regard to the day that you were at

6    Reynoldsburg shadowing this person that used to be

7    the owner of that location, did you have any

8    unprofessional interactions with him?  Maybe a

9    different way of putting it.

10   A.        Are you asking if was he unprofessional

11   with me?

12   Q.        Did you feel that he acted

13   unprofessionally towards you?

14   A.        I don't think so, no.

15   Q.        Was there anything that he said or did

16   that caused you concern or some sort of need for

17   alert, for alarm about working at Reynoldsburg?

18   A.        Yes.  He was not doing taxes correctly.

19   Q.        Okay.  And I'm not dismissing them.  But I

20   want to move on.  Other than that then, is there

21   anything else that you observed or saw this gentleman

22   do that gave you concerns or alerts about working at

23   Reynoldsburg?

24   A.        He overall seemed very detached, like he

```
 1    wasn't there, but he was.
 2    Q.          Was this an older gentleman?
 3    A.          Yes.
 4    Q.          In his 70s?
 5    A.          I don't know how old he was.  He looked
 6    older.
 7    Q.          Did you have any discussions with him
 8    about his experience as a -- or tenure as an owner or
 9    operator of the Reynoldsburg location?
10    A.          Not specifically that I can remember.
11    Q.          Did you have any conversations with this
12    gentleman about his training, education and
13    experience in tax preparation?
14    A.          Not that I can remember.
15    Q.          With regards to the -- I think you talked
16    about rounding concerns.  To the best of your
17    understanding, describe for me what it is that you
18    observed -- I'm assuming it's this gentleman that
19    we're talking about, this older gentleman -- what you
20    observed him doing and how many times you observed
21    him doing it.
22    A.          Well, it was only the one day I sat with
23    him.  But I think we only handled one client together
24    that day.  There wasn't a lot of business at the
```

1   location.  But he was -- There was a -- Specifically

2   we were taught to round numbers in tax school.  And

3   from what I remember, he was not rounding the correct

4   way forward.  He was rounding backwards.

5   Q.          Okay.  What do you mean by rounding

6   forwards versus rounding backwards?

7   A.          So rounding up to the nearest tenth versus

8   down.

9   Q.          So if there's a tax item that ends in .51,

10  you're supposed to round up to the next dollar; and

11  if it ends in .49 you round down, correct?

12  A.          Correct.

13  Q.          And if it's .5, what happens?

14  A.          What do you mean?

15  Q.          What if it's right in the middle, if a tax

16  item ends at .5 or 50 cents?

17  A.          I don't remember what the tax school

18  referred us to do.  I believe we were to round down.

19  Q.          And if you had a bunch of items in a

20  rounding group, were you to round each item up or

21  down, or were you to round up the sum of the items?

22  A.          Could you be more specific?

23  Q.          Sure.  I'll give you an example.  Let's

24  say you're looking at a charitable deduction,

1   contribution and you have four different sources of

2   charitable giving.  And one comes out to below 49

3   cents, another comes out to below 49 cents, and still

4   a third comes out to below 49 cents.  Would you round

5   each one of those down, or would you add all the

6   charitable deductions together and round either up

7   and down?

8   A.          I believe you would add them all together

9   and round up and down, but I don't remember

10  specifically what tax class told us to do.

11  Q.          Do you remember which tax return you were

12  working on when you observed the instance of

13  rounding?

14  A.          I don't remember the lady's name.  But it

15  was a female that was getting her taxes done that

16  day.  I believe it was the only one that came in and

17  got her taxes done that day.

18  Q.          And was that the only return that you

19  shadowed or observed with regards to this gentleman

20  that was there?

21  A.          Yes.  It was how long I was there.

22  Q.          And how long did it take to do that

23  return, because that sounds like an arduous day.

24  A.          I want to say it was maybe an hour and a

1    half, if that.  It wasn't too long.  It was pretty

2    quick.

3    Q.        So you had been in this location an hour

4    to an hour and a half on that one occasion?

5    A.        I stayed at the location all day.  That's

6    just how long that appointment took.

7    Q.        And what did you do the rest of the time?

8    A.        I was going over -- I don't remember what

9    it was specifically called.  But there were, like,

10   videos that you had to watch to begin; so I was doing

11   that in between.

12   Q.        And as best you can recall, Kaitlyn, where

13   on the return were these rounding issues coming up?

14   A.        The whole thing.

15   Q.        Okay.  Every line item he was either

16   rounding up or rounding down incorrectly?

17   A.        I don't remember specifically, but I know

18   he was rounding incorrectly on the return.

19   Q.        Did you bring this to this gentleman's

20   attention?

21   A.        No.  I felt like that was unprofessional.

22   I had just met him, and he wasn't my manager.

23   Q.        Did you bring it to anybody's attention?

24   A.        I brought to it Joy's attention.

```
 1   Q.          With regards to the day that you were in

 2   Reynoldsburg, do you remember what date that was?

 3   A.          I don't.  It was around the 9th or the

 4   10th.

 5   Q.          Of February?

 6   A.          Yes.

 7   Q.          And when did you report this concern to

 8   Joy?

 9               MS. BREEDLOVE:  Objection.

10   A.          The day it happened.

11               MS. BREEDLOVE:  Go ahead.

12   BY MR. HERSHBERGER:

13   Q.          Okay.  Were you still at the location when

14   you made this report?

15   A.          Was I physically there, or was I working

16   there?

17   Q.          Is there a distinction?

18   A.          Yes.

19   Q.          Okay.  Did you work from home?

20   A.          No.

21   Q.          Okay.  Would it be fair that if you were

22   working there, you had to be physically there to do

23   that?

24   A.          Yes.
```

Kaitlyn Porter
4/26/2022

1    Q.        Okay.  Were you still at the Reynoldsburg

2    location when you contacted Joy to report your

3    concern about rounding?

4    A.        I was not physically there, but I still

5    worked there, yes.

6    Q.        In other words, you were still employed

7    there?  You weren't just at the store?

8    A.        Right.

9    Q.        Where were you physically when you made

10   this call or communication with Joy?

11   A.        I was in the car.

12   Q.        Heading home?

13   A.        Yes.

14   Q.        Called her on your cell phone?

15   A.        Yes.

16   Q.        And to the best of your knowledge, were

17   you reaching Joy on her cell phone?

18   A.        Yes.

19   Q.        How long do you think the call lasted?

20   A.        I can't remember whose -- It was, I think,

21   very brief.  Maybe less than ten minutes.

22   Q.        Were there any other concerns that you

23   expressed to Joy other than this rounding concern

24   during that conversation that you can recall?

1  A.        Yes.  I had brought up the concerns I had

2  for training.

3  Q.        And in terms of you weren't finished with

4  it?

5  A.        In terms of the fact that I didn't feel

6  like it was efficient, especially for the liability

7  we held as tax preparers.

8  Q.        Did you have any discussions with the

9  folks at Two Guys and a Calculator about what

10 professional liability insurance they have in force

11 or effect to protect persons that may make errors on

12 a tax return?

13 A.        That information was not provided, nor was

14 I aware that that was something that I could utilize.

15 Q.        Did you inquire about it?

16 A.        I didn't know it was existent.

17 Q.        In this ten-minute conversation that you

18 had with Joy on either February 9 or 10, what were

19 the discussions beyond training and this rounding

20 incident that you observed?  Anything else that you

21 can recall?

22 A.        I had discussed the fact that I still

23 didn't have a PTIN, which I needed to practice solo

24 by myself and --

1    Q.          Did you say PTIN, P-T-I-N?  PTIN?

2    A.          Yes.

3    Q.          And can you describe for the Court and the

4    benefit of the record what a PTIN is.

5    A.          It's basically a number that -- for

6    yourself as a tax preparer to identify yourself on a

7    tax return.

8    Q.          Anything else that you can recall other

9    than the PTIN, the rounding, the training?

10   A.          There was some discussion of the location,

11   specifically me working at that location versus

12   working at West Gate.

13   Q.          Okay.  And anything else that you can

14   recall about this conversation other than the PTIN,

15   the location, the training, the rounding?

16   A.          Not to my knowledge.

17   Q.          Did Joy address your concerns about the

18   PTIN?

19   A.          Yes and no.

20   Q.          Describe that.

21   A.          I was told that I just needed to order it,

22   and I would be refunded for it.

23   Q.          Did that happen?

24   A.          No.

1   Q.          Okay.  And did it happen because your

2   employment was ultimately terminated before it could

3   happen?

4   A.          I don't know.

5   Q.          With regards to the training, how did that

6   resolve, if at all?

7   A.          It did not.  I was let go.

8   Q.          Did Joy think you needed more training?

9   A.          I don't think it was addressed.

10  Q.          Had you completed all the training modules

11  necessary to pass the tests as far as Liberty Tax was

12  concerned, to the best of your understanding?

13  A.          Can you be more specific to your question?

14  Q.          Sure.  Describe for me your training that

15  you had at Two Guys and a Calculator to be a tax

16  preparer.

17  A.          All I did was take the online courses.  I

18  did not have shadow time or physical training.

19  Q.          Well, you did have some shadow time at

20  Reynoldsburg at least on February 9 or 10, fair?

21  A.          No.  It was not done correctly.

22  Q.          And why do you say that?

23  A.          Because it was not done correctly.

24  Q.          What makes you say that?

1    A.        Well, the program that I had just watched

2    for hours on end online stated that it was to be done

3    one way, and he was doing it a separate way from

4    that.

5    Q.        I was talking about your training.

6    A.        I'm confused at what you're asking.

7    Q.        Sure.  I asked you to describe for me the

8    scope of your training, what that entailed.  You said

9    it was online, and then you said there's supposed to

10   be some shadowing.  And then I asked you, I said you

11   received some shadowing on February 9 or 10.  Let me

12   know if I'm saying anything out of order.  And then I

13   asked, you know, you got some shadowing that day, and

14   you said it wasn't done correctly.

15   A.        Correct.

16   Q.        And I asked you why you say that.

17   A.        Because he wasn't doing taxes correctly.

18   Q.        You were provided a shadowing opportunity

19   on at least February 9 or 10?

20   A.        Yes.

21   Q.        Was there supposed to be different

22   shadowing opportunities as you understood it --

23   A.        Yes.

24   Q.        -- prior to you starting at Reynoldsburg?

1    A.         Yes.

2    Q.         And did you discuss that with Joy?

3    A.         It was discussed, yes.

4    Q.         And what was decided or what you were told

5    was going to happen?

6    A.         I ultimately wasn't really told anything.

7    I was given an ultimatum of locations, not ultimatum

8    of training.

9    Q.         You've been a manager before, right?  I

10   mean, you've managed people?

11   A.         Yes.

12   Q.         Have you ever had to hire anyone?

13   A.         Yes.

14   Q.         Have you ever had to fire anyone?

15   A.         Yes.

16   Q.         You're familiar with concept of employment

17   at-will?

18              MS. BREEDLOVE:  Objection.

19   A.         Yes.

20   Q.         And what's your understanding as to what

21   employment at-will is?

22   A.         The law.

23   Q.         Okay.  And the law of what?  What does

24   that mean to you?  When someone says Kaitlyn is an

1    employee at-will for instance or Joy is an employee

2    at-will, what does that mean to you?

3    A.          I don't have a meaning of it.

4    Q.          Okay.  How many people have you ever

5    terminated, Kaitlyn?

6                MS. BREEDLOVE:  Objection.

7                You can answer.

8    A.          I can't remember off the top of my head.

9    I'd say probably ten or so.

10   Q.          And were those in situations where the

11   people were being let go for cause because they had

12   done something or not done something in their

13   employment?

14   A.          Generally, yes.

15   Q.          It may be specific conduct?  It may be

16   attendance?  It may be they cursed or broke some sort

17   of company policy?  Those sorts of instances, right?

18   A.          Yes.

19   Q.          And did you ever end up having to testify

20   in court or at an unemployment hearing because of a

21   termination that you made during your employment as a

22   manager?

23   A.          No.

24   Q.          Would you agree that an employer has a

Kaitlyn Porter
4/26/2022

```
 1    right to dictate the location of work that employees
 2    perform?
 3    A.          No.
 4    Q.          Why do you say that?
 5    A.          Because when you're hired, you're given
 6    the location then.  So at that point, you're hired
 7    for that reason and that purpose; so if it changes,
 8    that has to be agreed upon between the employee and
 9    employer.
10    Q.          And why do you say that?
11    A.          Because that was the original agreement
12    when the employee came to the employer.  The employee
13    doesn't come applying thinking that they won't know
14    where their location is going to be in three months.
15    Q.          Fair.  So I'll get to two things.  But,
16    one, say that those circumstances change, whatever
17    agreement there was originally as to where the
18    employee was to work.  The employer wants to change
19    that.  Okay.  That can happen, and it does happen,
20    does it not?
21    A.          Not in my experience.
22    Q.          Okay.  With regards to an agreement,
23    what's the genesis of this agreement?  Strike that.
24                When you were hired at Two Guys and a
```

```
1    Calculator, you started as a receptionist?

2    A.          Yes.

3    Q.          Okay.  And then did you express interest

4    in a tax training course?

5    A.          I did.

6    Q.          And was that because Shaniqua had also

7    expressed interest?

8    A.          No.  She had not been a part of the tax

9    school at the time.

10   Q.          So the employer in this case, Two Guys,

11   indicated that they would provide you the training or

12   the wherewithal, if you will, to become a tax

13   preparer for them?

14   A.          Yes.

15   Q.          And you took that training in terms of the

16   online coursework, correct?

17   A.          Correct.

18   Q.          And did you get a raise associated with

19   moving or transitioning from being a receptionist to

20   being a tax preparer?

21   A.          No.  I did, however, receive a raise in my

22   position as a receptionist.

23   Q.          Over the course of how long had you been

24   there before this raise?
```

1    A.        I can't remember.

2    Q.        While you were there a month and a half?

3    A.        Uh-huh.

4    Q.        So is it your testimony that you were such

5    an outstanding receptionist that they gave you a

6    raise in a month and a half?

7    A.        No.  I didn't say that.

8    Q.        Why did they give you a raise?

9    A.        Because I requested it.

10   Q.        From what to what?

11   A.        I think 12 to 12.50.

12   Q.        And when did that raise become effective?

13   A.        I don't know.

14   Q.        Would it have been the last week of your

15   employment?

16   A.        I don't know.

17   Q.        Would it have been commiserate with the

18   beginning of your training to become a tax preparer?

19   A.        No.  We were not paid differential to get

20   training.

21   Q.        I'm just talking about in terms of did it

22   coincide, you being bumped from 12 to 12.50 an hour,

23   with the time that you began training to become a tax

24   preparer?

Kaitlyn Porter
4/26/2022

87

1    A.        That's not a practice that they have.

2    Q.        I'm not asking you that, ma'am.  You want

3    me to ask the question again?

4    A.        Sure.

5    Q.        Do you know what the policies and

6    practices of Two Guys and a Calculator are?

7    A.        Do I know them all?  No.

8    Q.        Do you know any of them?

9    A.        Sure.

10   Q.        Were they given to you in writing?

11   A.        No.

12   Q.        Were they given to you in training modules

13   that you watched?

14   A.        Yeah.

15   Q.        Okay.  Were you given an employee

16   handbook?

17   A.        I believe they were provided.  I don't

18   remember how.

19   Q.        And who was it at Two Guys that provided

20   these policies to you?

21   A.        What do you mean?

22   Q.        What's the name of the person at Two Guys

23   that provided you with any of the company policies?

24   A.        I don't know.

```
1    Q.         Was Joy one of them?

2    A.         Sure.  She was a manager.

3    Q.         Which policies did she provide you with?

4    A.         I don't know.

5    Q.         Okay.  Did Tony Marucco provide you with

6    any policies?

7    A.         I don't know.

8    Q.         Other than Joy, can you name any other

9    person in management, either at the West Gate

10   or -- what's the LV?  What does that stand for?

11   A.         Lincoln Village.

12   Q.         -- Lincoln Village or Reynoldsburg

13   locations, any managers there that you can remember

14   providing you policies?

15   A.         I don't know.

16                           - - -

17              And, thereupon, Defendant's Exhibit J was

18   marked for purposes of identification.

19                           - - -

20   BY MR. HERSHBERGER:

21   Q.         Kaitlyn, I'm handing you what's been

22   marked as Exhibit J.  This is a packet -- from a

23   packet of materials I received from Gap in response

24   to a records subpoena.  Do you remember working for
```

1    the Gap?

2    A.          I did not.

3    Q.          Did you apply for employment at Gap?

4    A.          I did.

5    Q.          I want you to turn to Page 2.  This seems

6    to suggest to me that sometime in the pay period

7    ending September 28, 2019, you worked five hours at

8    or for the Gap.  Does that comport with your memory?

9    A.          This was for paid orientation.

10   Q.          Fair enough.  Turning your attention to

11   Page 3.  You did get paid for it then, right?

12   A.          Yes.

13   Q.          And turning your attention to Page 4.  Is

14   this the information on Pages 4, 5, 6, 7, 8 and 9

15   that you provided online when you applied for a

16   position at the Gap?

17   A.          Yes.

18   Q.          I think there's another page behind that

19   that actually has maybe a separate exhibit sticker on

20   it.  Keep going.  My apologies.  Keep flipping back.

21   Were you terminated from Big Guy's?

22   A.          Yes.

23   Q.          Did you receive any sort of performance

24   reviews when you were at Two Guys and a Calculator?

1    A.        Not that I remember.

2    Q.        Did you receive any sort of productivity

3    records or measurement of how well you were doing

4    your job?

5    A.        Not that I can remember.

6    Q.        Did you make a report of sexual harassment

7    to Two Guys and a Calculator?

8             MS. BREEDLOVE:  Objection.

9             You can answer.

10   A.        No.

11   Q.        Did you make a complaint of being

12   involuntarily reassigned to Two Guys?

13   A.        Yes.

14   Q.        And who did you make that to?

15   A.        Joy as well as Ariel.

16   Q.        And how was that re solved, if at all?

17   A.        It was not.

18   Q.        And did make that report on the day that

19   you were terminated?

20   A.        I do not remember the date.

21   Q.        Do you remember if it was within the first

22   week after you were terminated, Kaitlyn?

23   A.        I don't remember.

24   Q.        Do you remember whether the report was in

```
1    writing or whether it was a telephone conversation or

2    a text or a fax or what the form of the communication

3    was?

4    A.        Specifically to?

5    Q.        To Ariel or Joy regarding your

6    involuntarily reassignment.

7    A.        There were verbal conversations as well as

8    text messages and calls.

9    Q.        Did you maintain any sort of record of

10   those text conversations?

11   A.        I did not.

12   Q.        What about the calls?

13   A.        I didn't record them, no.

14   Q.        Make any notes?

15   A.        No.

16   Q.        As you sit here today, Kaitlyn, do you

17   have -- have you been treated for any sort of stress,

18   anxiety or emotional discomfort related to your

19   separation from employment at Two Guys?

20   A.        Yeah.  It was very stressful for a while

21   for me.

22   Q.        My question is whether you have been

23   treated.

24   A.        What does that mean?
```

Kaitlyn Porter
4/26/2022

```
 1    Q.         Medical treatment.

 2    A.              I guess I don't understand what you're

 3    asking.  Did I go to a doctor for my stress?

 4    Q.         Yeah.

 5    A.         No.

 6    Q.         Did you go to a counselor for your stress?

 7    A.         No.

 8    Q.         Did you see any sort of medical or mental

 9    health professional for your stress?

10    A.         No.

11    Q.         Any sort of pastoral or religious

12    counseling related to your stress?

13    A.         No.

14    Q.         How did you deal with your stress?

15    A.              Generally I tried to internally deal with

16    it.  Didn't have time to stop and see a doctor.

17    Q.              What did you do in those six months or so

18    between when your employment ended and your

19    employment began with your current employer?

20    A.              As it pertains -- What do you mean?

21    Q.              Give me a day in the life of Kaitlyn

22    Porter during those six months.  What sorts of things

23    were you doing?

24    A.              I maintained my full-time school status.
```

Kaitlyn Porter
4/26/2022

93

1   Q.         Took care of your kids?

2   A.         Yes.

3   Q.         When did you and Shaniqua get engaged?

4   A.         November of last year.

5   Q.         So this would have been after your

6   employment ended at Two Guys?

7   A.         Yes.

8   Q.         Did you ever introduce Shaniqua as your

9   wife to anybody at Two Guys?

10   A.         As my wife, no.

11   Q.         No?

12   A.         No.

13   Q.         Regardless of whether you introduced

14   Shaniqua that way, do you know whether any

15   representation was made in your hearing of Shaniqua

16   being your spouse?

17   A.         Not that I know of.

18   Q.         And to be fair, I was just asking whether

19   you heard that, because if that happened, from what

20   you're telling me, it wouldn't be accurate because

21   you guys didn't get engaged until after your

22   employment ended?

23   A.         Right.

24                   - - -

1          And, thereupon, Defendant's Exhibit K was

2     marked for purposes of identification.

3                    - - -

4   BY MR. HERSHBERGER:

5     Q.          Kaitlyn, I'm handing you what's been

6     marked as Exhibit K.  Is that your handwriting down

7     there at the bottom of where the signature line is on

8     the first page of this?

9     A.          No.

10    Q.          The reason I'm saying that is:  It says:

11    Offer of acceptance.  It says:  6/5/19, and it's a

12    letter ostensively addressed to you from Burger King

13    on behalf of Miller Management.  And I think this

14    might relate to the 3166 entity.  Have you ever seen

15    the first page of Exhibit K?

16    A.          No.  I don't even remember getting offered

17    this.

18    Q.          Well, let's turn the page.  Do you

19    remember getting paid?

20    A.          Yes.

21    Q.          Okay.  And if we look at Page 1, it

22    indicates where it says "regular compensation" on

23    Page 1, your regularly hourly wage would be $14, and

24    you get -- it would be time and a half overtime.  And

1    if I look at Page 2, it looks like the rate hours for

2    your regular earnings was $14 an hour.  Do you see

3    where I'm talking about?

4    A.        Yes.

5    Q.        Do you remember working then at Burger

6    King?

7    A.        Yes.

8    Q.        And if you turn to Page 3, you got paid

9    for it, correct?

10   A.        Yes.

11   Q.        And if we turn to Page 4, it looks like

12   you worked at Burger King over a number of pay

13   periods or at least pay dates in 2019, fair?

14   A.        Yes.

15   Q.        If we turn to the next page, this is the

16   beginning of one, two, three, four, five pages of an

17   employment application.  Is that information you

18   provided to Burger King related to your employment or

19   seeking employment there?

20   A.        Yes.

21             MR. HERSHBERGER:  This is L.

22                            - - -

23             And, thereupon, Defendant's Exhibit L was

24   marked for purposes of identification.

Kaitlyn Porter
4/26/2022

```
 1   BY MR. HERSHBERGER:
 2   Q.         Kaitlyn, I'm handing you what's been
 3   marked as Exhibit L.  This is your employment
 4   application for my client, Two Guys and a Calculator,
 5   correct?
 6   A.         Yes.
 7   Q.         And is Page 1 in your handwriting?
 8   A.         Yes.
 9   Q.         And is Page 2 in your handwriting?
10   A.         Yes.
11   Q.         And is Page 3 in your handwriting?
12   A.         Yes.
13   Q.         Is Page 4, the W-4 form, all in your
14   handwriting?
15   A.         Yes.
16   Q.         If we go a couple pages, you filled out
17   the form because it contains your Social Security
18   number throughout this.
19              MR. HERSHBERGER:  We'll redact it, Trisha.
20   BY MR. HERSHBERGER:
21   Q.         That's in your handwriting as well?
22   A.         Yes.
23   Q.         And then your employee's withholding
24   exception certificate is in your handwriting as well?
```

Kaitlyn Porter
4/26/2022

```
 1    A.          Yes.

 2    Q.          And signed by you?

 3    A.          Yes.

 4    Q.          On January 9, 2021, correct?

 5    A.          Yes.

 6    Q.          And following that, there's a three-page

 7    resumé; am I right?

 8    A.          Yes.

 9    Q.          And is that what you provided to Two Guys

10    and a Calculator in connection with your application

11    for employment there?

12    A.          Yes.

13    Q.          Thank you.

14                MR. HERSHBERGER:  Let's go off the record.

15                     (Recess taken.)

16                MR. HERSHBERGER:  Back on the record.

17    BY MR. HERSHBERGER:

18    Q.          Ms. Porter, you understand you're still

19    under oath?

20    A.          Yes.

21    Q.          When we left off, I think we had just

22    finished going through your application packet at Two

23    Guys.  How did you hear about the job at -- the

24    reception position at Two Guys?
```

A.          Tony had posted an ad in the Grove City
Connect group that I saw.

Q.          And did you apply online, or did you go
there in person?

A.          I don't remember.  I think I just had an
interview with Tony in person, and maybe I filled out
a paper app.  I can't remember how I applied.

Q.          And do you remember interviewing or Joy
being a part of that process when you met with Tony?

A.          I believe Tony interviewed me, and then
possibly she did the second interview.  I don't quite
remember.  I know Tony did an initial first
interview.

Q.          What was explained to you about where you
would be working as a receptionist?

A.          West Gate.

Q.          Is it the case that you ended up working
at multiple locations as a receptionist?

A.          I did volunteer to help close Lincoln
Village when they needed help.

Q.          You indicated in your application that you
were willing to relocate.  Were you contemplating
relocation at the time you applied at Liberty Tax?

A.          No.  I think generally that's just

1    selected to be more flexible for the company.

2    Q.        And what was it about your background that

3    made you think that a receptionist would be a good

4    position for you?  Or was it just a case of you

5    needed some money, and the receptionist position was

6    out there or neither of those?

7    A.        Reception is along the scale of

8    management.  It's time and building management, so in

9    my scope of work.

10   Q.        Were you given a job description for your

11   position as a receptionist at Two Guys?

12   A.        No.

13   Q.        What was explained to you would be your

14   duties as receptionist for Two Guys?

15   A.        I would be answering phones and then

16   helping people get situated coming in the door to

17   have their taxes prepared.

18   Q.        Did you have any understanding from your

19   discussions with Tony, Joy or anyone else during the

20   application and interviewing process that your job

21   duties as a receptionist would entail tax preparation

22   itself?

23   A.        No.

24   Q.        Similar question with respect to whether

1  your duties would entail as a receptionist getting

2  the actual tax forms out the door, either -- well,

3  I'm assuming mailed in one instance.  So you would be

4  responsible for mail?

5  A.          No.

6  Q.          What about pickups or deliveries to the

7  locations where you were a receptionist?  Would you

8  be tasked with making sure that the mail got

9  delivered or in the hands of the postal office person

10  or receiving the mail that came in and sorting it

11  out?

12  A.          No.

13  Q.          Did they have other persons to do that

14  as -- did you learn that they had other persons to do

15  that during your employment?

16  A.          I have no idea what the mail process was.

17  Q.          In addition to the receptionist position,

18  what other staff were on the locations, let's say,

19  West Gate?  There were tax preparers.  There was a

20  receptionist.  Who else was there?

21  A.          The sign folder.

22  Q.          The sign flipper?

23  A.          Yes.

24  Q.          This person that's dressed like a Statue

1   of Liberty?

2   A.          Yes.

3   Q.          I'm assuming you didn't do that?

4   A.          No.

5   Q.          Anyone else that you can think of?

6   A.          No.

7   Q.          Who was Ariel's boss?

8   A.          I think it was -- His name is Dave or it

9   started with a D.  I don't remember his name.

10  Q.          Do you remember Dave's last name?

11  A.          No.

12  Q.          Okay.  And would this be Ariel's boss just

13  for the West Gate store?

14  A.          I believe.  But that was the only location

15  she worked.

16  Q.          What is your understanding as to where Joy

17  Caudill fit into your chain of command?

18  A.          I honestly didn't.

19  Q.          Was Joy your supervisor?

20  A.          I don't know.  I knew she was a part of my

21  management team above myself.

22  Q.          Do you know whether Ariel directly

23  reported to Joy or not?

24  A.          No, I don't.

Kaitlyn Porter
4/26/2022

102

1  Q.          You touched on a little bit of this this

2  morning about whether Shaniqua had applied for a

3  position at Liberty Tax, Two Guys, as well.  Did she

4  ultimately do that?

5  A.          I don't think she applied.  They provided

6  her with a means to start tax school.  And I don't

7  think she ended up getting to that place with them.

8  Q.          Prior to applying for the receptionist

9  position at Two Guys, did you have any training,

10 education or experience in preparing tax returns

11 other than your own?

12 A.          I frequently would help people file taxes.

13 I was pretty familiar.

14 Q.          And by "people," did you get paid to do

15 this?

16 A.          Just family and friends.

17 Q.          Family and friends.  Okay.

18            What was explained to you when you applied

19 for the receptionist position and spoke with Tony and

20 the others as to how long the employment would last?

21 A.          It was expressed that the office was only

22 open until about April-ish.  So it was seasonal work.

23 Q.          And then what would happen after that?

24 Was that discussed?

Kaitlyn Porter
4/26/2022

103

```
 1    A.          No.
 2    Q.          What was your expectation when you
 3    interviewed for the receptionist position and when
 4    they told you, "Hey, come April we're going to be
 5    closing up shop"?
 6    A.          What was my expectation?
 7    Q.          Yes.
 8    A.          I didn't have one.
 9    Q.          Was there an anticipation that they were
10    going to keep you on or let you go?
11    A.          I didn't have an expectation.
12    Q.          How long did it take from, kind of, the
13    application itself to starting as a receptionist?
14    A.          I don't remember.  I want to say maybe
15    like a week.  Not long.
16    Q.          Was any sort of training provided?
17    A.          As far as?
18    Q.          Anything that you needed to understand or
19    do as a receptionist.  I'll be candid with you.  I
20    couldn't be a receptionist anywhere because I don't
21    know how to answer phones.  They baffle me to this
22    day.
23    A.          I remember going to a separate location.
24    I want to say it was a closed location that they no
```

Kaitlyn Porter
4/26/2022

1    longer used anymore.  I believe it was one day.  It

2    could have been more than that.  And I believe we

3    went over, as a whole, things to prepare taxes.

4    Preparers and receptionists, I believe they kind of

5    did like a group day where they went over things I

6    think mainly.  So training was necessary to use the

7    program that they were in the office with.

8    Q.          Was there another person that was being

9    trained to be a receptionist at another store when

10   you went through your one day of training?

11   A.          Yes.  Kathy.

12   Q.          Do you remember Kathy's last name?

13   A.          No.

14   Q.          And where does Kathy ultimately end up

15   being placed, if you know?

16   A.          Lincoln Village.

17   Q.          And on those occasions when you closed or

18   substituted over at Lincoln Village, were you subbing

19   in for Kathy?

20   A.          No.  I believe I was subbing for another

21   young lady that was maybe -- Yeah.  I believe she was

22   going to be a tax preparer from reception and was

23   helping them fill in the same as I was, to fill the

24   position.

1    Q.        Help me out.  How many receptionists were

2    there at the West Gate store during the time that you

3    were there?

4    A.        One.

5    Q.        And what were your hours typically?

6    A.        I think I was 9:00 to 4:00 or 9:00 to

7    5:00.  I cannot remember which one.

8    Q.        Did the store have hours after 4:00?  Did

9    that location have evening hours?

10   A.        Yes.  Another receptionist came in to

11   relieve me at night, I believe from 4:00 or 5:00 or

12   9:00 or 8:00.

13   Q.        So it sounds like there were two

14   receptionists.  You would fulfill most of the daytime

15   responsibilities.

16   A.        Yes.

17   Q.        And then someone else might come in to

18   help close?

19   A.        Yes.  I believe her name was Amanda.

20   Q.        And were there times where you helped

21   close for evening stores either at West Gate or

22   Lincoln Village?

23   A.        No.  I was not a night closer.  I worked

24   during the day.  I would help them out at night with

```
 1    Lincoln Village if they needed help for closing.

 2    Q.          Kaitlyn, do you remember any sort of

 3    written policies or handbooks being shared with you

 4    when you applied -- excuse me -- when you accepted

 5    employment at Two Guys?

 6    A.          No.

 7    Q.          Did you receive any written promise of

 8    continued employment while you were at Two Guys?

 9    A.          Not that I can remember.

10    Q.          Did you sign any sort of contract, as best

11    you can recall, concerning the terms and conditions

12    of your employment at Two Guys?

13    A.          Not that I can remember.

14    Q.          How long were you at Two Guys when the

15    subject of you possibly taking on tax preparer

16    responsibilities came up?

17    A.          I don't think long.  Maybe two to three

18    weeks.

19    Q.          Was that something that you expressed

20    interest in yourself?

21    A.          Yes.

22    Q.          And why was that?

23    A.          It would offer more money.

24    Q.          And what sort of pay increase did you
```

1    understand you would be receiving?

2    A.          From what I was told by other preparers,

3    there was an hourly rate difference as well as a

4    commission.

5    Q.          And explain to me what you understand that

6    to be.

7    A.          I'm not sure of either, to be honest.  It

8    was never expressed what the difference in hourly pay

9    and the difference or the actual commissions off of

10   each one would be.  From what I understand, it was --

11   a portion of the fee that was charged to the customer

12   would have been a portion of your commission.

13   Q.          Okay.  But in terms of an hourly, because

14   that's kind of set in stone, if -- I know you're

15   working 40 hours in a position that pays $10 an hour

16   and you're going to be moving to a position that pays

17   more at 40 hours.  You know, that's kind of set in

18   stone.  Your commissions may not be.  I'm just

19   signposting that to see if you can express to me your

20   understanding as to -- I think you're making $12 to

21   start, correct?

22   A.          Yes.

23   Q.          And did you understand as a tax preparer,

24   you might be making 15 or more dollars per hour or

1    something more or less than that?

2    A.        I was basing it off of what Ariel told me

3    she was making.  But I also knew she was a manager,

4    so I knew there was probably a differential there

5    too, so I honestly did not know.

6            MR. HERSHBERGER:  Did we get this down on

7    the record about she doesn't have any documents

8    responsive to the duces tecum or anything to

9    supplement her discovery, does she, Trisha?

10           MS. BREEDLOVE:  Not at this time, now that

11   you ask.

12           MR. HERSHBERGER:  I'll do it for kicks and

13   giggles.

14           This is A.

15                      - - -

16           And, thereupon, Defendant's Exhibit A was

17   marked for purposes of identification.

18                      - - -

19   BY MR. HERSHBERGER:

20   Q.        Kaitlyn, I'm handing you what's been

21   marked Exhibit A to your deposition.  This is the

22   notice I sent.  So that's why we're here today, in

23   addition to the fact that your counsel and I mutually

24   scheduled this time and time tomorrow to talk to the

1    witnesses and the parties.  I'm going to turn your

2    attention to Page 3.  And I know in conjunction with

3    discovery responses that you submitted in this case,

4    I got a whole bunch of tax documentation, tax forms.

5    I think there might have been like a 2019, maybe 2020

6    return.  And then subsequently that was supplemented

7    with -- I got a copy of the EEO charge.  And all

8    that's been provided to me.

9          So I think we've covered this, but I just

10   want to make sure.  So I'm going to ask with regard

11   to No. 1, I think we've covered this this morning,

12   that you haven't sought any sort of treatment for the

13   strain that you're claiming resulted from your

14   termination, correct?

15   A.        No professional -- I'm confused.

16   Q.        And what's confusing?

17   A.        Can you restate your question?

18   Q.        Sure.  And you may have been reading, so

19   that's okay.  If you get distracted, just let me

20   know.

21          We covered this morning that you have not

22   received any sort of professional treatment for any

23   sort of stress, strain, anxiety, any sort of medical

24   treatment or counseling of any sort, fair?

1    A.        Correct.

2    Q.        So it doesn't sound like there would be

3    any documents of that treatment.  So that kind of

4    addresses item No. 1 on Page 3 in front of you, fair?

5    A.        Yes.

6    Q.        The documents that you provided to the

7    EEOC or the OCRC regarding the allegations made in

8    the complaint, your counsel sent to me the charge.

9    We'll get to that in a little bit.  Are you aware of

10   any other documents that you sent to the EEO in

11   connection with your charge or your complaint other

12   than the charge itself?

13   A.        No.

14   Q.        So no statements, tape recordings, texts,

15   fax, anything like that, correct?

16   A.        No.

17   Q.        Am I right?

18   A.        Yes.

19   Q.        And it is the case, whether you sent it to

20   the EEO or not, that you don't have any tape recorded

21   statements of anyone, fair?

22   A.        Correct.

23   Q.        Have you, yourself obtained any written

24   statements from any witness?

1          MS. BREEDLOVE:  Objection.

2          You can answer.

3   A.       No.

4   Q.       I think there was some screenshots.  And I

5   stand corrected.  I think there's some screenshots

6   that you took of some pay advice.  It was probably a

7   screenshot of a computer, like literally maybe from

8   your phone, taking a shot of a computer, showing pay

9   advice from the time that you were at Two Guys.  Do

10  you remember taking at all?

11  A.       No.

12  Q.       Did you have remote access or online

13  access to the pay advice, the payroll information for

14  the hours that you worked at Two Guys?

15  A.       Do I currently or did I then?

16  Q.       Did you?

17  A.       I don't remember.  But I think there was a

18  portal I could log into.

19  Q.       Have you tried that portal recently?  It

20  would surprise me if you could get into it.

21  A.       No.

22  Q.       Did you maintain any personal notes or

23  diaries concerning what you were going through at the

24  time of your termination?

```
 1    A.        No.

 2    Q.        Were you ever given any sort of document

 3    indicating the reasons or grounds for your discharge?

 4    A.        No.

 5    Q.        I believe you received an employment

 6    compensation for a period of time while you were off

 7    work after your separation, fair?

 8    A.        No.

 9              MS. BREEDLOVE:  Objection.

10    BY MR. HERSHBERGER:

11    Q.        Is it your statement that as you're

12    contending you received no unemployment compensation?

13              MS. BREEDLOVE:  Objection.

14              You can answer.

15    A.        That's correct.  I did not.

16    Q.        Do you remember receiving any unemployment

17    compensation in 2021?

18    A.        I don't remember.

19                            - - -

20              And, thereupon, Defendant's Exhibit B was

21    marked for purposes of identification.

22                            - - -

23    BY MR. HERSHBERGER:

24    Q.        Handing you what's been marked as
```

1    Exhibit B, Kaitlyn.  Can you identify that as the

2    charge of discrimination that you caused to be filed

3    with the EEOC?

4    A.        Yes.

5    Q.        Did you personally prepare this?

6    A.        No.

7    Q.        Did you review it before it was sent to

8    the EEO?

9    A.        Yes.

10   Q.        And is that -- There's a doc signature --

11   or a DocuSign down at the bottom left-hand corner of

12   Page 1 dated 7/15/2021.  Did you direct someone or

13   did you personally indicate that an electronic

14   signature would be appropriate for this document?

15   A.        I believe I DocuSigned it.

16   Q.        So is this something that you saw on,

17   like, a portal, and then it asked you to DocuSign it,

18   and you did, and it was submitted?

19   A.        Correct.

20   Q.        You indicated on the front page of this

21   Exhibit B of this EEOC charge that you were

22   interested in mediation if the respondent was also

23   interested.  And I know that this was dated July 15,

24   2021.  And then if we turn to the second to last

1  page, it looks like you got a right to sue letter

2  dated July 19, 2021, which is four days later.  Do

3  you have any understanding as to why the right to sue

4  letter issued so quickly after your charge?

5  A.          I would assume the office was just

6  handling their due diligence in getting it done.

7  Q.          The office being the EEO?

8  A.          Yes.

9  Q.          And the reason I'm asking this, Kaitlyn,

10  is if you look at the right to sue letter, the

11  notice, two boxes are checkmarked; and one says it's

12  less than 180 days past since the filing of the

13  charge, but I -- and that presumably is Dana R.

14  Hutter or someone on his or her behalf, has

15  determined it's unlikely that the EEOC will be able

16  to complete its administrative process within 180

17  days from the filing of this charge.  There's also a

18  checkmark or a box checked that says the EEOC is

19  terminating its processing of this charge.  Did you

20  direct the EEOC to terminate its processing of the

21  charge?

22          MS. BREEDLOVE:  Objection.

23          Answer if you know.

24  A.          No.

1    Q.        And all these questions are, you know, if

2    you know.  If you don't know, that's a perfectly

3    appropriate response.  I'm not trying to ask you to

4    guess.  I'm just asking what information you had.  So

5    fair enough.

6              Turning to the front -- the face page on

7    Exhibit B.  You understood when you submitted this

8    that this was, you know, something that was under the

9    penalty of perjury?

10   A.        Correct.

11   Q.        You indicated at the end of the second

12   paragraph under the particulars, kind of in the

13   middle of the page, the last two sentences end with

14   the following quote:  I later learned Joy alleged

15   that I refused work at the time of my termination.

16   Joy gave no reason and just said I was being let go.

17             At the time, in July -- mid July of 2021,

18   did you have access to your texts and text exchanges

19   with Joy on the date up to and including your

20   termination?

21   A.        Did I on 7/15 have access to those text

22   messages?

23   Q.        Correct.

24   A.        No.

Kaitlyn Porter
4/26/2022
116

```
1   Q.        Why is that?
2   A.           I actually broke the phone that had them
3   in it, so I had to get them replaced.
4   Q.           What were the circumstances in which that
5   phone broke?
6   A.           I dropped it into a pond fishing.
7   Q.           And prior to that point -- Well, it took,
8   it looks like, about five months for your concerns to
9   get to the form that -- that resulted in a charge
10  being filed.  And during those five months, did you
11  do anything to preserve what information you did have
12  on your phone that reflects the circumstances
13  surrounding your termination?
14              MS. BREEDLOVE:  Objection.
15              You can answer.
16  A.           I preserved it until an accident happened.
17  Q.           And what did you do to preserve it?
18  A.           I locked the text messages into my phone
19  so that it wouldn't delete.  They kept them.
20  Q.           Were they stored to the Cloud?
21  A.           No.
22  Q.           Were they printed out at all?
23  A.           No.
24  Q.           And when did the phone go into the pond?
```

Kaitlyn Porter
4/26/2022
117

```
1    A.          I can't remember the specific date.  But

2    it was probably about a month after my termination.

3    Q.          So sometime in early March or mid March?

4    A.          About mid March, yeah.

5    Q.          It is the case -- and I think as you

6    stated this this morning -- that you weren't married

7    until February 22 of this year?

8    A.          Correct.

9    Q.          Were you engaged during your employment at

10   Two Guys?

11   A.          No.

12   Q.          The line in Exhibit B that says that you

13   are an openly homosexual woman, and then you used the

14   term "your supervisor" to describe Joy Caudill,

15   learning that you are a lesbian when your wife

16   brought you lunch one day at work.  I want to focus

17   kind of on that.  First of all, why do you say that

18   Joy Caudill was your supervisor?

19   A.          Because she was once I went to

20   Reynoldsburg.

21   Q.          And is it your testimony that she had no

22   supervisory or management responsibilities over the

23   receptionist position while you were at either

24   Lincoln Village or West Gate?
```

Kaitlyn Porter
4/26/2022

118

1    A.         That was my understanding, yes.

2    Q.         And is it possible that your understanding

3    is incorrect or incomplete?

4    A.         Yes.

5    Q.         The reference to lunch being brought to

6    you one day at work is not date specific, so I want

7    to ask.  As best as you can recall, Kaitlyn, as you

8    sit here today, what day or approximate date was this

9    that someone brought you lunch at work.

10   A.         It was either February 8 or 9.

11   Q.         Which location were you working at that

12   day?

13   A.         Reynoldsburg.

14   Q.         And this would have been the one day that

15   you were there shadowing?

16   A.         Yes.

17   Q.         So on that day, was there a receptionist

18   at the Reynoldsburg store when you were there that

19   day?

20   A.         Yes.

21   Q.         So on that date that you shadowed, it

22   would have been you, Joy Caudill, a receptionist and

23   this 70-year-old gentleman that you were shadowing in

24   the store?

Kaitlyn Porter
4/26/2022
119

```
 1    A.        Correct.

 2    Q.        Was there anyone else that you can recall?

 3    A.        There was not.

 4    Q.        Tell me, as best you can recall, about

 5    this exchange where you were brought your lunch at

 6    work while you were at Reynoldsburg in February of

 7    2021.

 8    A.        What about it?

 9    Q.        What happened when -- I'm assuming this is

10    Shaniqua that brought you lunch?

11    A.        Uh-huh.

12    Q.        Is that a yes?

13    A.        Yes.

14    Q.        She brought your lunch.  She gave it to

15    you.  And how is it that the subject of you being a

16    lesbian came up or the fact that you were a lesbian

17    was discovered?

18    A.        Well, I couldn't tell you when she did.  I

19    don't have her understanding of it.

20    Q.        Well, you said that Joy Caudill learned

21    that you were a lesbian.  And you said that she

22    learned that you were a lesbian when someone brought

23    you lunch one day at work.

24    A.        Uh-huh.
```

1    Q.        And we've testified that that was the day

2    that you were at Reynoldsburg --

3    A.        Uh-huh.

4    Q.        -- when Joy and the gentleman that you

5    were shadowing and a receptionist were all there.  So

6    is this some sort of temporal thing, or was there

7    actually an event that occurred inside the store in

8    Reynoldsburg?

9    A.        After my lunch got dropped off, she

10   inquired on who it was.  I answered.  I mean, that's

11   the extent of it I guess.  I don't --

12   Q.        Okay.  And that might help explain things.

13   What was the substance of your response when Joy

14   Caudill asked, "Who is that bringing you your lunch"?

15   A.        My spouse.

16   Q.        And what was Joy's response to that, if

17   anything?

18   A.        I don't think there was a response.

19   Q.        Did she express surprise, concern?  Did

20   she say, "Oh"?  I'm just trying to figure out if

21   there's anything that you can remember as you sit

22   here today.

23   A.        I do not remember.

24   Q.        After Shaniqua brought you your lunch, did

1    she stay around?

2    A.          No.

3    Q.          Was Shaniqua's name brought up by Joy the

4    rest of that day?

5    A.          Not that I can recall.  I think she may

6    have inquired if it was the same person who was doing

7    the tax school.

8    Q.          Do you have any reason to believe that the

9    first time that Joy Caudill saw Shaniqua was this day

10   in Reynoldsburg that we've been discussing?

11   A.          No.  She had, like I said, been going

12   through the tax school as well and had been in

13   contact with her privately on her own accord for

14   that.

15   Q.          And how was -- Has Shaniqua shared with

16   you her interactions with Joy?

17   A.          Not very well.  She didn't end up getting

18   hired because Joy stopped responding to her text

19   messages.  So --

20   Q.          And which text messages were these?  At

21   least temporally, were these before or after your

22   termination?

23   A.          Before.

24   Q.          And have you seen those text messages?

1    A.        Yeah.

2    Q.        Are they still on Shaniqua's phone as far

3    as you know?

4    A.        No.  She had an Android at the time.  They

5    cycle out every 30 days with the text messages.

6    Q.        Whether they cycle out or not, did

7    Shaniqua ever download or print off or share the

8    substance of those text messages with you or anyone,

9    to the best of your knowledge?

10   A.        I saw them, but I don't know if she has

11   downloaded them or shared them with somebody else.

12   Q.        Shaniqua knew that you were going to be

13   bringing this charge, didn't she?

14             MS. BREEDLOVE:  Objection.

15             You can answer if you know.

16   A.        No.  She wouldn't because I didn't make

17   that decision until July.

18   Q.        You didn't share with Shaniqua, your now

19   spouse, that you were going to be filing a charge

20   with the EEOC over the termination of your employment

21   at Two Guys?

22             MS. BREEDLOVE:  Objection.

23             You can answer.

24   A.        No.

1    Q.        Why not?

2              MS. BREEDLOVE:  Objection.

3    A.        Obviously, because until July I hadn't

     made that decision.

4

5    Q.        But once you did file, I mean, it's out

6    there, right?  I mean, what was to prevent you from

7    bringing this to her attention, "Hey, I'm filing a

8    charge.  I think I was wrongfully terminated"?

9    A.        If we're talking about in July, then, yes.

10   Q.        Shaniqua was aware that you had concerns

11   about the circumstances surrounding your termination

12   from Two Guys prior to July, didn't she?

13   A.        Yes.

14   Q.        In fact, I'm sure you shared with her that

15   day that you were terminated that you had concerns

16   and that you felt that your firing was unjust?

17             MS. BREEDLOVE:  Objection.

18   BY MR. HERSHBERGER:

19   Q.        Fair?

20             MS. BREEDLOVE:  You can answer.

21   A.        Yes.

22   Q.        As best as you can recall, what did the

23   texts between Shaniqua and Joy say, if anything?

24   A.        Shaniqua had notified Joy that she

1   completed her tax school.  She then notified her -- I

2   think she asked her what was the passing grade after

3   that and then also inquired on when she could start.

4   Q.          And do you know when any of those texts

5   were sent in relationship to your termination at Two

6   Guys?

7   A.          No.  I'm not aware of the time frames that

8   they were sent.

9   Q.          What is your pay today, either your salary

10  or hourly, at your present position as a property

11  manager?

12  A.          Salaried at 55,000 a year.

13  Q.          Have you received any sort of performance

14  evaluation or probationary review, if you will, of

15  how you're doing?

16  A.          No.

17  Q.          Do you have an understanding as to whether

18  you'll ever be in window for such a thing, on either

19  a six-month or a yearly basis?

20  A.          At a year mark.

21  Q.          Which for you will be in July?

22  A.          August.

23  Q.          Excuse me.  I want to turn back to a topic

24  and finish this out, Kaitlyn.  We were talking about

Kaitlyn Porter
4/26/2022

125

```
 1    Joy learning that you were a lesbian when lunch was
 2    brought to you at the Reynoldsburg store.  Do you
 3    recall -- Strike that.
 4              Has anyone -- Strike that.
 5              Has Shaniqua shared with you any
 6    conversations that she had with Joy Caudill after
 7    your termination?
 8    A.        Yes.
 9    Q.        Okay.  And what has she shared with you
10    was discussed?
11    A.        The position that she was seeking.
12    Q.        Anything else?
13    A.        No.
14    Q.        So she didn't inquire on your behalf about
15    the circumstances surrounding your termination, fair?
16    A.        No, she did not.
17    Q.        But at the time that she would have been
18    talking with Joy, it was after your termination; and
19    she was aware of your termination, she being
20    Shaniqua --
21              MS. BREEDLOVE:  Objection.
22    BY MR. HERSHBERGER:
23    Q.        -- because you had told her?
24              MS. BREEDLOVE:  Objection.
```

1    A.        No.

2    Q.        Let me rephrase my question.  At the time

3    that Shaniqua spoke with Joy after your termination,

4    would you have informed her about your termination?

5              MS. BREEDLOVE:  Objection.

6    A.        I do not think they spoke after my

7    termination.

8    Q.        Okay.

9    A.        I'm not aware of it.

10   Q.        And that was -- That's a little bit

11   different than what you said earlier, and that's

12   fair.  I want to make sure that we have a good

13   understanding.

14             So it's your testimony that you don't

15   believe Shaniqua spoke with Joy after you were

16   terminated, fair?

17   A.        Correct.

18   Q.        Fair?

19   A.        Yes.

20   Q.        Are you aware whether Shaniqua tried reach

21   out to Joy in any regard after your termination?

22   A.        I'm not aware, no.

23   Q.        And is it the case that your termination

24   happened within a day or two after you being at the

Kaitlyn Porter
4/26/2022

127

1    Reynoldsburg store?

2    A.        Yes.

3    Q.        What do you recall Joy indicating to you

4    with regards to your concerns about the rounding

5    incident?  Did she indicate that she was going to

6    take it up with the gentleman that you were

7    shadowing?

8    A.        No, she did not.

9    Q.        Did she indicate that she was going to

10   take any action?

11   A.        No, she did not.

12   Q.        Did you ask her whether she was going to

13   take any action?

14   A.        Yes, I did.

15   Q.        And what did she tell you?

16   A.        I do not recall.

17   Q.        Had you reported the rounding incident to

18   anyone other than Joy?

19   A.        No.  There was nobody else to report it

20   to.

21   Q.        Would Tony Marucco have been an

22   appropriate person to bring that to the attention of?

23   A.        In the situation, yes; but the chain of

24   command would state that I go to Joy.

1   Q.          Okay.  Well, who, in your understanding,

2   is in the chain of command above Joy?

3   A.          Tony and Mary I believe her name was.

4   Q.          This Dave person that you had mentioned

5   this morning, is he a manager at the Lincoln Village

6   store or the West Gate store?

7   A.          It was my understanding that he was the

8   manager over West Gate.

9   Q.          Prior to your shadowing day at

10  Reynoldsburg, how did you and Joy get along?  Was it

11  a professional relationship?

12  A.          Yes.

13  Q.          Any concerns that you had about her

14  leadership or management style?

15  A.          I didn't really work with her much, so I

16  would say no.

17  Q.          Had you had a chance to observe Joy

18  terminate anyone's employment?

19  A.          No.

20  Q.          Had you had a chance to observe Joy hiring

21  anybody else?

22  A.          No.

23  Q.          Before you were placed in the Reynoldsburg

24  store to be a tax preparer, did you train your

1    replacement receptionist at West Gate?

2    A.         Yes.

3    Q.         Tell me about that.  How did that happen?

4    A.         In terms of?

5    Q.         The facts that you can recall about how it

6    is that you came to train your replacement

7    receptionist at West Gate?

8    A.         I mean, she just showed up, and that was

9    expected of me.

10   Q.         And who set those expectations?

11   A.         In a sense of what?

12   Q.         In a sense of what you were just talking

13   about.  You used the words, "It was expected of me."

14   I'm not trying to argue with you.  I'm just using

15   your words.  So those expectations had to be set.

16   A.         Well, it was a -- You know, the

17   expectation that is -- There's an expectation that I

18   don't sit and stare at a corner while I'm at work.

19   So if somebody shows up for a receptionist position

20   and you're a receptionist, it's implied that you

21   help.

22              I don't think that there was anybody who

23   specifically said, "Train this person."  However, I'm

24   sitting in their seat, using their computer while I

```
1    do my work; so it's implied that they're going to sit

2    behind me and ask me questions, so that's what

3    happened.

4    Q.        Okay.  Let's back up and explore this

5    maybe a little bit -- step or two earlier.

6              Do you remember the name of the person

7    that you trained to be your replacement as a

8    receptionist at West Gate?

9    A.        No.

10   Q.        Was it a male or female?

11   A.        It was a female.

12   Q.        Did that person's presence at West Gate

13   surprise you the day that she showed up?

14   A.        Yes.

15   Q.        And why is that?

16   A.        I was unaware that they were hiring for

17   another receptionist.

18   Q.        Had it been explained to you that there

19   was an expectation that the company would be moving

20   you to Reynoldsburg?

21   A.        No.

22   Q.        So you hadn't been looking to move closer

23   to the Reynoldsburg store or anything like that?

24   A.        No.
```

```
1    Q.         Were you in the process of moving

2    residences during your employment at Two Guys?

3    A.         Yes.

4    Q.         And where did you move from?

5    A.         What do you mean?

6    Q.         Where -- Like, what address did you

7    move -- What address were you living at when you

8    began at Two Guys?

9    A.         7005 Westfall Road.

10   Q.         And that's in Lancaster?

11   A.         Uh-huh.

12   Q.         Yes?

13   A.         Yes.

14   Q.         And where did you move to?  Where was the

15   next place you moved to?

16   A.         I believe it was 806 Harrisburg Pike.

17   Q.         And which end of town is that here in

18   Columbus?

19   A.         The west side of Columbus.

20   Q.         Is it closer to West Gate?

21   A.         Yes.

22   Q.         Did you have instances at -- or during

23   your employment at Two Guys where you had

24   weather-related events that caused you to be late to
```

Kaitlynn Porter
4/26/2022

```
1    work or miss work?

2    A.          I can't recall.

3    Q.          Did you have instances when you were

4    employed at Two Guys where you needed to cut out of

5    work early to attend to a funeral or a sick friend or

6    an event?

7    A.          Yes.  I had one incident where I needed to

8    leave early.  I had lost a family friend.

9    Q.          And was Two Guys accommodating in letting

10   you out of work for that?

11   A.          I don't know about accommodating.

12   Q.          Well, accommodating would be letting you

13   take the time off and not firing you.  That would be

14   one level of accommodation I suppose.

15   A.          I don't feel that's accommodating, but

16   sure.  That happened.

17   Q.          Well, you were in your first, you know, 30

18   or 60 days, correct, by the time this event that

19   you're talking about happened where you had to miss

20   work --

21   A.          Yes.

22   Q.          -- to attend a friend -- I mean, you

23   understood that there was no policy saying that you

24   were going to get paid time off or even have
```

1  bereavement days as far as you were aware, fair?

2  A.          I don't know.  I wasn't aware of the

3  attendance.

4  Q.          Well, it's a reasonable expectation of

5  every employer, is it not, Kaitlyn, because you've

6  managed people, that people show up to work when

7  they're scheduled and on time and leave on time?

8  A.          I'm also a human and have a heart and

9  understand that when people lose people, they need

10  time off.

11  Q.          Let's signpost this.  I'm asking you in

12  your experience as a manager.  Okay.

13  A.          That is my experience as a manager.  I

14  treat my employees like humans.

15  Q.          We're talking over one another.  You're

16  not letting me ask my question.  So let me ask this

17  because I want to be really clear about this, and I

18  want you to understand the question.

19          You have experience as a manager for

20  employers who have a reasonable expectation that

21  their employees show up to work on time and work

22  their shift as best as they can, fair?

23  A.          Yes.

24          MR. HERSHBERGER:  Let's go to whatever

```
 1   this is now.

 2                         - - -

 3           And, thereupon Defendant's Exhibit D was

 4   marked for purposes of identification.

 5                         - - -

 6   BY MR. HERSHBERGER:

 7   Q.          Kaitlyn, I'm handing you what's been

 8   marked Exhibit D to your deposition.  Have you seen

 9   this document before?

10   A.          Yes.

11   Q.          Okay.  Do you recognize it as a string of

12   text messages between you on the one hand and Joy

13   Caudill on the other?

14   A.          Yes.

15   Q.          Do you think that there's anything in this

16   string that's been left out, omitted, not captured?

17   A.          There are a few places where my text

18   messages end up at the bottom and seem to possibly

19   have been cut off.

20   Q.          I want to go through this with you.

21   Page 1, this is the first text, and that's January

22   12, in the evening.  The words:  Good evening.  Just

23   heard of the good news of the switch.  Do I have

24   Harrisburg now, is that your text?
```

```
1    A.          Yes.

2    Q.          Is the Harrisburg store -- I mean, you

3    have a West Gate store.  You have Lincoln Village.

4    Is Harrisburg its own store as well?

5    A.          Yes.

6    Q.          Had you expressed interest in taking on a

7    receptionist position at Harrisburg?

8    A.          Yes.

9    Q.          So prior to this June -- or this January

10   12 text that we're discussing, you were working at

11   West Gate?

12   A.          Yes.

13   Q.          Joy responded to that text, and that's

14   kind of the bolded section there in dark colors with

15   the white lettering, fair?

16   A.          Yes.

17   Q.          The next page starts with, if I understand

18   this correctly, Joy saying:  Did you drive by at all

19   today?

20               And the response:  I did at lunch.

21               Do you have any context to that exchange,

22   Kaitlyn?

23   A.          That is referring to the West Gate

24   location office.
```

1    Q.        Let's turn the page then.  And it looks

2    like we're still on January 12.  So if I go from the

3    previous page with you saying:  Sounds great.  See

4    you then.  Hopefully the groceries made it, I'm

5    assuming that's some reference to your groceries or

6    maybe Joy is sitting in a car or something like that.

7    A.        Joy's son was having a hard time getting

8    the groceries home on that day.

9    Q.        And if you turn the page, Joy responds:

10   They did.  And I got several rude comments that I

11   expected.  Ha.

12   A.        Yes.

13   Q.        January 13 at 9:38 a.m., it just says:

14   1:45 E.  I don't know what that means.  But it looks

15   like it was a text from you.  Do you have any context

16   or explanation as to what that might signify,

17   Kaitlyn?

18   A.        I honestly don't remember.  I have no

19   clue.

20   Q.        On January 14 at 4:26, you text to let her

21   know that you forgot to clock out.  And maybe it was

22   just textese and something -- a verb got dropped.

23   But are you just letting her know that you forgot to

24   clock out at the end of your shift at West Gate?

1    A.          Correct.

2    Q.          And if you turn the page, it looks like

3    Joy wanted to know, "Hey, when did you leave" so that

4    she might be able to back it into the payroll system?

5    A.          Correct.

6    Q.          And you let her know that it was at

7    4:22-ish because it happens to comport with the text,

8    so you said:  4:22-ish.  I wasn't too far behind.  I

9    texted immediately.  Is that what's captured here on

10   this page?

11   A.          Yes.

12   Q.          And I'm talking about a page that's really

13   tiny.

14   A.          59.

15   Q.          But it's 59 at the bottom.  Thank you.

16              And Joy says:  Sounds good.  Look forward

17   to seeing you tomorrow afternoon.

18              You say:  No worries.  And now we're onto

19   Page 60.  You text her saying:  I wanted to bring

20   something too you.  I think "too" was supposed to be

21   T-O, but you wrote T-O-O.  I don't want to make a big

22   deal.  But the night receptionist brought her child

23   with her.  I just had concerns so I thought I should

24   let you know.

```
 1                    And Joy said:  Thank you.

 2                    Do you remember that text exchange and any

 3     conversations surrounding it?

 4     A.        Yes.

 5     Q.        What was the concern there, Kaitlyn?

 6     A.        The night receptionist was very

 7     unprofessional and disorganized.  She would come in

 8     either late with her child or with an issue.  At any

 9     rate, at this point, she had ended up bringing her

10     child with her I think a couple days in a row, and it

11     was just -- it was getting to a point where something

12     needed to be said.

13     Q.        So as you're coming off, the night

14     receptionist is coming on, and you can see that she

15     has her child with her, fair?

16     A.        Yes.

17     Q.        And you wanted Joy to know about that?

18     A.        Correct.

19     Q.        Do you have a conversation as well as a

20     text?

21     A.        I can't remember, but I believe so.

22     Q.        And do you remember how that resolved or

23     what information was provided and what Joy said she

24     might do with your information?
```

```
 1    A.          I honestly don't remember.

 2    Q.          At the bottom of Page 60, it says:

 3    January 15 at 7:46 p.m.  You text:  Just -- excuse

 4    me -- Walked in.  Just arrived.  He's the guy from

 5    earlier.  He states he's waiting for you to give you

 6    paperwork.  He insists on waiting.  I'm now turned

 7    over on to Page 61, but it looks like this is all

 8    part of one text.

 9               And it doesn't look like there's any

10    response to this text Friday at 7:46 p.m. until

11    Saturday at 1:35 p.m.  And it's kind of a non

12    sequitur because it looks like Joy is reaching out to

13    you and says:  Kaitlyn, do you have a minute for me

14    to call?

15               Is my understanding, your understanding as

16    well, in terms of you put this out there, Joy didn't

17    respond to it by text at least until this text on

18    Saturday at 1:35?

19    A.          Are you referring to the text that states:

20    He's waiting?

21    Q.          Right.  The conversation that starts on

22    the end of Page 60 and rolls over to Page 61.

23    A.          Correct.  But in all honesty, I feel like

24    we were working together and possibly the response
```

1    was in person from Joy.

2    Q.          Do you have any reason to believe that Joy

3    handled your concerns inappropriately or incorrectly?

4    A.          As it pertains to the text message?

5    Q.          Yeah.  As it pertains to this exchange

6    that begins on Page 60 and goes into 61 about this

7    gentleman arriving, someone from earlier, and he's

8    waiting?

9    A.          I'm pretty sure I was just notifying her

10   by text because she was in her office, and he was

11   waiting for her in the lobby.

12   Q.          Got it.  And let's turn to this Saturday,

13   January 16 at the bottom part of the Page 61:

14   Kaitlyn, do you have a minute for a call?

15            And you respond:  Yeah.  I do.  Do you

16   remember what that call was about at all?

17   A.          I don't remember.

18   Q.          I'm now on Page 62, and I'm signaling

19   Monday, January 18 at 4:12 p.m.:  Is Amanda coming?

20   Who is Amanda?

21   A.          The night receptionist.

22   Q.          And she, being Joy, texts back:  No.  She

23   will not be in.  Sorry.

24   A.          I believe she was supposed to report at

1   4:00.

2   Q.          As a result of Amanda not coming in, did

3   you work over that night?  Do you recall?

4   A.          I don't remember, honestly.  I just know

5   nobody was notified.

6   Q.          So what result, if any, or what

7   consequence was that for you?  Did you end up having

8   to cover part of the shift or --

9   A.          I know at 4:12, so twelve minutes past the

10  shift, I was still in the office because usually my

11  practice is not to leave the desk until she gets

12  there just because it leaves the office short

13  staffed.  But I don't remember or recall if I did or

14  did not work that night.

15  Q.          So I want to turn now to Page 63.  And

16  you're writing on Tuesday, January 19 at 9:37 a.m.:

17  Can I write in these books?  Are they mine to keep,

18  or do I need to return them?

19              And Joy responds:  They are yours.

20              I'm going to put a hard stop right there.

21  Are we talking about now the tax preparer materials?

22  A.          Yes.  Yes.

23  Q.          So had you begun those tax preparer

24  materials over the weekend?  This is Tuesday, January

Kaitlyn Porter
4/26/2022

1   19.  I'm wondering if you got these materials either

2   the previous Friday or Saturday.

3   A.          I would say yes.  It was within a few days

4   right before this, because I would have asked to

5   write in them pretty immediately.

6   Q.          So by January 19, you had been working for

7   Two Guys about ten days?

8   A.          Yeah.

9   Q.          Maybe less?

10  A.          Yeah.  Yes.

11  Q.          Then I'm going to pick up after my hard

12  stop in the middle of Page 63, Kaitlyn.  Joy texts:

13  Was the lady sitting across from your desk yesterday

14  your friend that wants to do the rapid class as well?

15          And looks like you replied:  Thank you.  I

16  appreciate it.  Yes.  We did her taxes.

17          And that's the end of that page.  And I

18  think she responds on the next page:  Okay.  Thank

19  you.

20          I want to ask you about that exchange.

21  What's your understanding as to what's being

22  discussed in this exchange with the lady sitting

23  across from your desk?  Is she talking about Shaniqua

24  or someone else?

1    A.         She's talking about Shaniqua.

2    Q.         So at this point, Joy is aware that

3    Shaniqua is your friend and has expressed some

4    interest in doing the rapid tax preparer class just

5    as you're doing?

6    A.         Yes.

7    Q.         And you said:  Yes.  We did her taxes so

8    I'm assuming that Shaniqua was also a client of the

9    office as well?

10   A.         Yes.

11   Q.         We're on Page 64.  Joy writes to you -- or

12   texts you:  Hi, Kaitlyn.  Please tell me how you're

13   doing on your test because I'm excited to get you

14   going and introduce you to the Reynoldsburg office.

15   Have a good day.

16              And your response is:  I'll be finished

17   today.  About 20 questions left.  And then on the

18   following, it says:  Who all will be at that office?

19   I hear Stacy isn't going to be there.

20              And you finish up that text:  Also, can we

21   get my -- and it says P 10.  And I think you actually

22   mean P-T-I-N?

23   A.         Yes.

24   Q.         So on January 22, Joy is telling you of an

```
 1      expectation that she's going to have you go to the

 2      Reynoldsburg office, fair?

 3      A.          Yes.

 4      Q.          She's asking how you're coming along with

 5      the tax preparation materials, the modules or whatnot

 6      of the online stuff?

 7      A.          Uh-huh.

 8      Q.          Yes?

 9      A.          Yes.

10      Q.          It sounds like you have some written

11      materials that you're allowed to write in that

12      supplement that or complement the online stuff as

13      well?

14      A.          Yes.

15      Q.          Are there any other materials that are

16      provided to you to help you along with learning the

17      stuff online or what you're reading?

18      A.          No.

19      Q.          I'm now on 65, Kaitlyn.  Who is Stacy?

20      A.          That is a manager from the, I believe,

21      Harrisburg Pike location.

22      Q.          Man or woman?

23      A.          Lady.

24      Q.          And did you get along with Stacy or not?
```

1    A.          Yeah.

2    Q.          And all I'm getting at, Kaitlyn, is this:

3    You're interested in whether Stacy is there or not.

4    How did that come to be?

5    A.          So the dynamics of staff was kind of being

6    discussed between all of the staff throughout all of

7    the locations.  Everybody was trying to figure out

8    who was getting moved and where everybody was going

9    to be.  Discussions were had that some people were

10   going here, and then they were shuffling there.  So I

11   think this was us trying to figure out who was going

12   to be where.

13   Q.          And "us" being who?

14   A.          Myself, Ariel and then Shaniqua as well

15   because she was interested in being a tax preparer.

16   Q.          It so sounds like there's discussions at

17   least at the Ariel level and above in terms of

18   management, that there's a Reynoldsburg location that

19   has to be staffed, and some people are going to have

20   to be moved around.  Was that your understanding back

21   then?

22   A.          Yes.

23   Q.          Was there another location in addition to

24   the Reynoldsburg that was acquired at that time?

1     A.          Not that I was aware of.

2     Q.          Were there other stores that needed

3     staffing because people had either left or were

4     moving around?

5     A.          Yes.

6     Q.          Tell me what your understanding was of

7     that.

8     A.          I knew that they needed staff at almost

9     all of their locations.

10    Q.          The PTIN, P-T-I-N, that's referenced in

11    the middle of Page 65 on Exhibit D is what allows you

12    to sign and file tax returns?

13    A.          Correct.

14    Q.          So did you have an understanding -- Strike

15    that.

16                Did you have an understanding back in mid

17    January that you were going to have to complete the

18    tax preparation coursework in order to get your PTIN?

19    A.          Yes.

20    Q.          Following up then on the end of Page 65,

21    Joy texts:  Your PTIN needs to be applied for on the

22    IRS website.  It's going to be $13.95 and we will

23    reimburse you after you get it.  Please send me the

24    confirmation PDF once done through email.  Do you see

```
1     where I'm reading generally?

2     A.        Yes.

3     Q.        Did you apply for your PTIN?

4     A.        Yes.

5     Q.        Did you pay the 35.95?

6     A.        Yes.

7     Q.        Did you get reimbursed for it?

8     A.        No.

9     Q.        On January 22 at 1:07 p.m. -- we're now on

10    Page 66 on this exhibit -- you text that you're

11    finished with your coursework.  So you're moving

12    along.  It looks like you completed the coursework in

13    the span of approximately five days?

14    A.        Yes.

15    Q.        And was this while you were also doing

16    reception work?

17    A.        Yes.  As well as full-time school.

18    Q.        And was it the case that you had resources

19    at your receptionist desk at West Gate or Lincoln

20    Village that you could do the coursework while you

21    were also doing your receptionist job?

22    A.        We weren't supposed to, but generally they

23    encouraged us to do it in downtime.

24    Q.        My question might be a little bit
```

```
1   different.  Did you do it ever on the clock?

2   A.         My coursework?

3   Q.         Yes.

4   A.         Yes.

5   Q.         So in response to your text about you

6   being finished with your coursework, she says:  Cool.

7   I'll get back with you on the next steps later today.

8              There's some discussion about the

9   reimbursement:  Can Tony use the card here at this

10  location and Joy indicating they're not credit cards.

11  Are they talking about the reimbursement for your

12  PTIN?

13  A.         Yes.

14  Q.         Turn the page to 67.  I think there's some

15  discussion about the timing of you being reimbursed

16  and you saying:  Unfortunately, I'll have to wait

17  until I get paid to purchase.  So it's a cash flow

18  problem for you --

19  A.         Yes.

20  Q.         -- to spend the 35 now.  So you're waiting

21  for the paycheck, and then you'll be able to pay for

22  the PTIN, and then you'll get reimbursed.

23             Joy texts you on Friday, January 22.  This

24  is towards the bottom of Page 67:  You're not going
```

1    to need your PTIN yet anyway.  There's going to be

2    more training online.

3              And you respond:  Cool.

4              Do you see where I'm reading?

5    A.        Yes.

6    Q.        Okay.  Next page is Page 68.  She's

7    saying:  Hey, can you come to Lincoln Village at 9:00

8    tomorrow?  I want to talk about the other training

9    for tax prep.  And then she says:  Never mind.  I

10   forgot I had to go to West Gate -- I think what's

11   that WG stands for --

12   A.        Yes.

13   Q.        -- in the morning.

14             And you're like:  Hey, we'll get to it

15   when we get to it.

16             And if you turn to Page 69, Joy texts you:

17   Hopefully a new receptionist gets hired tomorrow.

18   After I train them to take over at West Gate, I'll be

19   having you come to Reynoldsburg to train with me.

20             And you say:  I'm concerned about the

21   switch.  I love my office.  My environment makes up

22   much of the overall job enjoyment.

23             And I'm just going to stop right there.

24   This text exchange, Kaitlyn, the one that we're

1    talking about on Page 69, Exhibit D, did this result

2    in any sort of telephone conversation, further

3    conversation between you and Joy about her plans to

4    have a receptionist hired to take over your job at

5    West Gate so you can go over to Reynoldsburg to train

6    with Joy?  Was the a telephone conversation about

7    that on or about January 24?

8    A.          I don't know if it was a telephone

9    conversation, but I think we did have an in-person

10   conversation.  I think a conversation was had.

11   Q.          Would it have been on January 24, more

12   likely the following day?

13   A.          I believe it was probably the following

14   day.  I can't remember.

15   Q.          Let's turn the page to Page 70 then.  It

16   looks like this conversation that I put the hard stop

17   on a moment ago continued, and Joy expresses her

18   understanding.  It says she had to get used -- had to

19   use the clients there to get her social interaction.

20   Let's talk about it tomorrow when I come down there.

21              And you say:  Sounds great.

22              And that kind of comports with what you're

23   telling me, Kaitlyn.  So it picks up on Monday,

24   January 25 with you texting Joy:  Hey, Joy.  Still

1    swinging by this morning.

2              And Joy responds:  Sometime, yeah.

3              And then if we turn the page, we go from

4    9:05 a.m. on Monday to 6:38 on Monday.  It looks like

5    the day got away from someone.  But in any event, Joy

6    texts:  I haven't forgotten about you.  I had a

7    showing I forgot about.  I'll text you when I get

8    home.  Sorry I didn't text sooner.

9              Actually, I take that back.  That's

10   actually -- That's your text, right?

11   A.        No.  Wait.  Which one?

12   Q.        On Page 71.  My apologies.

13   A.        No.  That's her text.

14   Q.        Okay.  So it was Joy that had a showing

15   that she had forgotten about, and she'll text you

16   when she gets home?

17   A.        Correct.

18   Q.        Showing of her house?

19   A.        I didn't inquire.

20   Q.        Okay.  Do you remember a conversation that

21   you had with Joy on the evening of Monday, January

22   25?

23   A.        I don't think we talked on this day.

24   Q.        Okay.  Do you have any reason to believe

1    there's any gaps in this text exchange that have been

2    omitted?

3    A.          It's possible.  I don't know.

4    Q.          Let's turn to Page 72.  And we're now on

5    the morning of January 26 after leaving off the

6    evening of January 25.  And Joy texts you:  Hi,

7    Kaitlyn.  Right now the Reynoldsburg office is only

8    open until 7:00 p.m.  I will be there again until

9    7:00 tomorrow if you can swing by on your way home.

10   Sorry I didn't get your message yesterday until it

11   was too late to let you know.

12              And then you reply at 12:24:  Okay.  How

13   could I get a letter of the employment verification?

14   My question is:  What is that in reference to,

15   Kaitlyn, a letter of the employment verification?

16   A.          A letter that verifies my employment.

17   Q.          To be given to who or for what purpose?

18   A.          To myself for verification.

19   Q.          Was this to be given to a landlord so that

20   you could move and they could ensure that you had

21   employment and were gainfully employed?

22   A.          Yes.

23   Q.          So would it be the case that around

24   January 26, you were in the process of moving from

Kaitlyn Porter
4/26/2022

1    Westfall in Lancaster over to Harrisburg?

2    A.          Yes.

3    Q.          Now we're on Page 73.  It says:  Okay.  So

4    I want to go east.  How do you feel about me

5    remaining reception until I get more comfortable in

6    prep.  I can do both and jump to prep in between.  I

7    expected to shadow here comfortably.  Switching

8    teachers can throw a wrench in things.  I want to try

9    and meet -- I think that's supposed to be "the"

10   instead of "tie" -- the company's needs with mine.

11   And that page ends, and that text ends.

12             Do you have any reason to believe that

13   there was more to that text than what's on Page 73,

14   Kaitlyn?

15   A.          It could have been.

16   Q.          Do you have any idea what could have been

17   left off?

18   A.          No.

19   Q.          Okay.  So here you're expressing you want

20   to go east.  What is east?  Reynoldsburg?

21   A.          Yes.

22   Q.          So you're expressing you want to go to

23   Reynoldsburg, but you want to remain in reception

24   until you get more comfortable doing tax prep, fair?

1   A.          Precisely.

2   Q.          And you're thinking maybe you can do a

3   little bit of both, I'm assuming training and prep.

4   I'm trying to understand what you meant by, "I can do

5   both and jump to prep in between"?

6   A.          Sure.  So as I'm a receptionist, my

7   thought was that I could do reception and be able to

8   then in between fulfilling my job duties watch

9   preparation of taxes as a person doing them was

10  literally sitting at a desk behind me.  So it was

11  easy for me to turn around and watch prep as I still

12  maintained my job duties.

13  Q.          Okay.  The end of that paragraph on Page

14  37, that first paragraph says:  Switching teachers

15  can throw a wrench in things.  Who was your teacher?

16  At West Gate I'm assuming.

17  A.          It was Ariel and her sister.  And then

18  there was -- I want to say there was a man that was

19  jumping around that was at that location as well, but

20  he wasn't there frequently.  I don't remember.  But

21  those two were the normal 9:00 to 5:00-ers with me.

22  Q.          Did you feel -- Had you shadowed Ariel or

23  her sister?

24  A.          I hadn't gotten the opportunity to yet.

1   They were kind of verbally teaching I guess.  I

2   hadn't gotten to watch any taxes.

3   Q.          And with all that, you did feel

4   comfortable, however, being with Ariel and her sister

5   doing the teaching or training or shadowing, fair?

6   A.          Yes.  I felt like they were knowledgeable.

7   Q.          Did you have any concerns with Joy doing

8   the teaching or training or providing the shadowing?

9   A.          No.

10  Q.          Let's turn to Page 74.  Joy texts you:

11  The shadowing must be done here because there are a

12  few things done differently.  We are not going

13  to -- I'm assuming that's 100 percent -- change

14  everything they do since we are retaining two people.

15          Did you understand that when Joy sent

16  this, she was referencing, and you interpreted it as,

17  the Reynoldsburg store?

18  A.          Yes.

19  Q.          Okay.  Your response is:  No worries.

20  That's why I suggested reception transition.  Is it

21  fair to say, given that text, Kaitlyn, that you knew

22  that the company was going to be replacing you as the

23  receptionist at West Gate ultimately?

24  A.          No.  That's a very far leap.

Kaitlyn Porter
4/26/2022

156

1  Q.          And the reason I'm asking that is:  If you

2  turn back to Page 69, on Sunday, January 24, you had

3  received a text from Joy indicating that she was

4  going to be training a new receptionist to take over

5  at West Gate and having you come to Reynoldsburg to

6  train with her.  And then on Page 74 -- and we're now

7  two days later -- Joy is indicating that the

8  shadowing must be done at Reynoldsburg because

9  there's some things done differently, and they're

10  retaining two people.

11  A.          Uh-huh.

12  Q.          So at least by the date that this text was

13  sent at the top of Page 74, you weren't quite certain

14  that you were going to be replaced as a receptionist

15  at West Gate?

16  A.          Correct.

17  Q.          Let's pick up in the middle of Page 47 on

18  down.  You write:  No worries.  That's why I

19  suggested reception transition.

20          And Joy texts you:  There is a

21  receptionist here right now from the previous

22  company.  And she's referencing Reynoldsburg,

23  correct?

24  A.          Correct.

1    Q.        And that's how you understood it at the

2    time, right?

3    A.        Correct.

4    Q.        Now we're on Page 75, and you text Joy:

5    Hey, I need to take off a tad early today to drop off

6    verification forms.

7              What verification forms are we talking

8    about?  Is this the employment verification things

9    that they provided?

10   A.        Yes.

11   Q.        Ariel is staying until Amanda gets here.

12   Is that okay with you?

13             And she writes, "she" being Joy:  That's

14   fine, Kaitlyn.  Dave is coming down in a little bit

15   too so that Ariel can go home and rest that back

16   side.  I'm assuming that's accounting and tax

17   preparer humor for the fact that people are working

18   long hours including people like yourself, fair?

19   A.        Yes.

20   Q.        Let's turn the page.  We're on Page 76.

21   You write:  Awesome.  Thanks, Joy.  Keep burning that

22   tax oil.  And there's a couple of colloquies about

23   what makes the oil go and keep people going.  Kind of

24   impertinent, so we'll just go to Page 77.

Kaitlyn Porter
4/26/2022

158

1          And you text Joy at 8:30 on January 28

2     that you're running a little bit behind, and you'll

3     be in as soon as possible.  Was Joy okay with that?

4     A.          There was no response.

5     Q.          Okay.  Do you remember what was causing

6     you to run late other than the fact that you had

7     overslept a little bit?

8               MS. BREEDLOVE:  Objection.

9               You can answer.

10    A.          No.  I don't remember.

11    Q.          And I'm saying because it's the end of

12    June.  I didn't know if it was a weather-related

13    event or anything in addition to just the fact that

14    you overslept.

15    A.          It could have been, but I don't recall.

16    Q.          You text at 10:45 on January 29.  This is

17    in the middle of Page 77.  I think that's supposed to

18    be Christy, unless it's Charity.

19    A.          Christy I think.

20    Q.          Okay.  Christy states she has another job

21    and cannot work this Tuesday or Wednesday.  You write

22    Christy.  Duh.  Sorry.

23              Is Christy another receptionist?

24    A.          I believe she was the one who ultimately

1    replaced myself at West Gate, but I can't remember.

2    Q.          Joy responds:  Just next week only.  And

3    it looks like you responded at the top of Page 78:

4    Yes.  I can cover it.  She won't be trained by

5    Monday.  She picks up okay but not too fast.

6              So are you referencing Christy picking up

7    the receptionist job?

8    A.          Yeah.  I was training her at the time.

9    Q.          Okay.  So you understood you were training

10   a replacement for you?

11   A.          Yes.

12   Q.          And we're now on January 29, correct?

13   A.          Yes.

14   Q.          Picking up in the middle of Page 78.  Joy

15   says:  No problem.  Still want to train you as much

16   as you can today.  And if she is ready to -- and if

17   she is ready, be at Reynoldsburg on Monday.  We have

18   two other day receptionists to cover everything those

19   two days.  If you can, I need you at Lincoln Village

20   this evening.  Do you remember that exchange and the

21   circumstances surrounding it, Kaitlyn?

22   A.          I don't remember the circumstances.

23   But --

24   Q.          Did you have any problem fulfilling the

```
 1   need to cover the receptionist at Lincoln Village
 2   that evening?
 3   A.          I don't remember.
 4   Q.          Were you paid all the hourly wages that
 5   you earned at Two Guys, to the best of your
 6   understanding?
 7   A.          Are you asking me do they owe me money?
 8   Q.          I'm asking you:  For the hours that you
 9   worked, were you paid?
10   A.          Yes.
11   Q.          And I'm now on Page 79.  And I think we
12   referenced this a little bit earlier, Kaitlyn, about
13   the balloon release for your friend Haylen.  And
14   you're requesting an accommodation.  And it kind of
15   goes over to Page 80 asking to get leave to prepare
16   for that event, even though it sounds like your
17   trainee/replacement person isn't there yet.
18   Contextually is that right, or have I missed
19   something about the context of this exchange on 79
20   and 80?
21   A.          Correct.  I was requesting to leave early,
22   as there was nothing pertinent left for me to do, and
23   the trainee had not shown up.
24   Q.          Fair enough.  If we turn to Page 81, this
```

```
 1    is Joy's response.  She says:  Attendance is very

 2    important to us, but she understands it's something

 3    that -- this event is important to you.  And you can

 4    read the rest for yourself there, Kaitlyn.

 5             My question is:  And after this text that

 6    Joy sent responding to your request for some time

 7    off, did you have any telephone conversations with

 8    Joy about your need to miss -- or to leave work a

 9    little bit early to attend this event?

10    A.         I don't remember.

11    Q.         Okay.  And did you interpret this text

12    that Joy sent on Page 81 as just saying, "Hey, you

13    know, attendance is important.  We understand there's

14    going to be exceptions.  Just let us know as far as

15    you can in advance so that we can get your shift

16    covered."  Is that how you interpreted it back then

17    when you read this the first time?

18    A.         Yes.

19    Q.         Okay.  Fair enough.

20             And, in fact, I just answered my own

21    question.  My apologies.  But if you turn to Page 82,

22    it looks like you understand.  On February 1 -- we're

23    now in the middle of Page 82 -- you write:  Meet out

24    east or Lincoln Village.  She says:  Lincoln
```

1   Village -- this is Joy -- that's where you will be

2   this week.

3            And you write:  Okay.

4            So did you work reception at Lincoln

5   Village all of February 1 and February 2?

6   A.       I don't remember, but I believe so.

7   Q.       And if I turn to the bottom of Page 82, it

8   looks like there's a snow event because you're

9   referencing a level two, which I'm assuming is a

10  level two travel emergency --

11  A.       Yes.

12  Q.       -- about people probably shouldn't be on

13  the roads unless they have to.

14           If we turn to Page 83, Joy is indicating:

15  Hey, we're open.  If you can't make it in, let her

16  know.  She's going to be at West Gate.  If you'd like

17  to make it in there, you're welcome to go to

18  Reynoldsburg and finish your training.  Just let her

19  know.  She'll have to let Mike know, fair?

20  A.       Yes.

21  Q.       Did you have any questions about what Joy

22  was -- you know, the information that Joy was giving

23  you on -- in this text on Page 83?

24  A.       No.

```
 1    Q.          Let's move to 84.  It looks like there's
 2    still road stuff going on on February 1 and into
 3    February 2., so I won't bore anyone with that.  We're
 4    onto Page 85.
 5              You text Joy at 9:00 a.m. on February 3:
 6    Sorry, Joy.  Headed to you now.  I know you told me.
 7    I couldn't remember and just wanted you to be here
 8    -- wanted to be here.  See you soon.
 9              Is this you just saying, "Hey, I'm running
10    a little bit late," or what Is going on that resulted
11    in you sending this text at 9:06 on February 3?
12    A.          I don't remember.
13    Q.          Okay.  February 4:  What's the passing
14    score on midterm?  And if we turn to Page 86, it
15    looks like "70 I think" was Joy's response.  Were you
16    talking about your own midterm?
17    A.          No.  At this point, I had passed that.  I
18    was asking for Shaniqua, as she had never received a
19    response from Joy.
20    Q.          Got it.  We're on Page 87.  That last
21    sentence says:  I need to have you behind clients at
22    Reynoldsburg next week with me so that you will be
23    solo.  So I think that's -- This is being sent on a
24    Friday, so it sounds to me like Joy is signaling to
```

```
 1    you come the following Monday the expectation is
 2    you're going to be at Reynoldsburg, fair?
 3    A.         Yes.
 4    Q.         Is that how you understood it at the time
 5    it was sent?
 6    A.         What do you mean?
 7    Q.         That Joy was expecting you to be at
 8    Reynoldsburg the following Monday?
 9    A.         Yes.
10    Q.         Fair enough.  We're onto Page 88.  And in
11    response to the 7:42 text, you replied at 8:46 a.m.:
12    No problem.  I'll get it done today.  I'll make it in
13    this weekend to do the practice binder too so I have
14    the confidence I need.  Did you actually go in to the
15    office that weekend?
16    A.         I don't remember.
17    Q.         Was it possible to do this practice binder
18    at home?
19    A.         No.  You needed the program to do it with
20    the binder.  The binder is kind of like a fake, like,
21    return, and you use it to go through the system.
22    Q.         Understand.  About four hours later you
23    text Joy:  Hey, the apartment complex left me a VM,
24    which I assume is voicemail.  Apparently they can fit
```

1    me in at 3:00, I assume p.m., today.  Videos are

2    almost done as well.  It's a little bit disjointed in

3    terms of subject matters, but I think I understand

4    this.

5                So let me ask.  The apartment complex left

6    me a voicemail.  Apparently they can fit me in at

7    3:00 today is a reference to the apartment that you

8    were moving into on Harrisburg Pike, letting you know

9    they have a unit for show?

10   A.          It was -- I had to be there by 3:00 to

11   sign for the unit.

12   Q.          So you're actually signing the lease that

13   day at 3:00?

14   A.          Uh-huh.

15   Q.          Was that a yes?

16   A.          Yes.  Sorry.

17   Q.          And then the reference to videos are

18   almost done as well is a reference to you finishing

19   up your video training for the tax prep course?

20   A.          Yes.  I believe there was some videos you

21   had to watch afterwards.  I can't quite remember.

22   But I remember watching videos.

23   Q.          Let's turn to Page 89.  And you reply:

24   Okay.  Hope this -- Joy replies:  Okay.  Hope this

1    will be the end, and you'll move in.  Had there been

2    issues dealing with the landlord over there at

3    Harrisburg --

4    A.          Yes.

5    Q.          -- trying to get a lease in front of you?

6    A.          Yeah.  It was scheduling.  They were never

7    available at a decent time for me.

8    Q.          And probably pretty frustrating as

9    somebody who has been a property manager I assume.

10   A.          Yes.

11   Q.          You respond:  Me too.  It's been quite the

12   feat.  I'll be so much closer too.  Thanks, Joy.

13   Have a good day.

14              So I think we're now picking up at the end

15   of 89 on the next week.  So we've gone the weekend,

16   and it's now Monday, February 8 at 7:32 a.m.  Going

17   to put a signpost there, Kaitlyn.

18              Do you remember having any conversations

19   with Joy Caudill over the weekend of Friday, February

20   5; Saturday, February 6; Sunday, February 7 about

21   your assignments, your duties, what Two Guys'

22   expectations were going to be for you, where,

23   anything concerning work?  Did you have a

24   conversation with Joy over that weekend?

```
 1    A.          Not that I remember.

 2    Q.          Monday at 7:32 Joy texts you:  Hi,

 3    Kaitlyn.  My schedule this week is Monday and

 4    Thursday at Lincoln Village and Tuesday, Wednesday

 5    and Friday at Reynoldsburg.  You can work where I am

 6    if you'd like.  Next week it's Reynoldsburg every

 7    day.

 8               Okay.  And did you understand that that's

 9    Joy setting your schedule for basically this week of

10    February 8 and then the following week of February

11    15?

12    A.          Yes.

13    Q.          If we turn the page to Page 90, your reply

14    apparently is:  That works out.  Be with you.  And

15    then a little bit later on that Monday you say:  I

16    keep failing this test.  Was there a certain module

17    or part of the tax prep materials that you were

18    having challenges with?

19    A.          Yeah.  I think overall after you watch the

20    videos, you had a final test that I was having

21    trouble passing.

22    Q.          But at least with respect to the schedule,

23    if we look at Page 89 and 90, you know, Joy is

24    telling you where she needs you and when.  And you
```

1  respond:  That works out.  Be with you.  And then

2  there's some concerns obviously with the test module

3  that we just talked about.  And it looks like people

4  are still digging out from snow events, and it's

5  causing some concerns with your car.

6  A.          Yes.

7  Q.          We're on Page 91 now.  Joy texts you:

8  Okay.  I'm staying on the west side to keep an office

9  open.  I need to finish your fusion test and shadow

10  Mike.  Please do not spend a lot of time on your

11  phone, as you are being paid.

12          And your response is:  Can I just do my

13  training from home?

14          Joy indicates:  Not for pay.  We don't

15  allow that.

16          Then I'm just going to stop right there.

17  I am assuming that this conversation, this text

18  exchange is Tuesday, February 9 because if I turn to

19  Page 92, it looks like there's still Tuesday,

20  February 9 texts on it.  So do you remember this

21  exchange that's on Page 91, Kaitlyn?

22  A.          Yes.

23  Q.          Did you have any sort of telephone

24  conversation with Joy during this couple hours or

1   whatever that it took to exchange the texts that you

2   see on Page 91?

3   A.          I don't remember.

4   Q.          Do you know who Mike is that's being

5   referred to in Joy's first text on Page 91?

6   A.          I think that was the previous owner of the

7   Reynoldsburg location.

8   Q.          So this is this 70-some-year-old guy that

9   you shadowed?

10  A.          I think so.

11  Q.          Do you know, other than being an owner

12  of -- or the operator of the Reynoldsburg Liberty Tax

13  franchise before Two Guys took it over, what Mike's

14  background was in tax prep or any qualifications that

15  he had?

16  A.          I was told that he was a preparer and an

17  owner at that location.

18  Q.          Do you remember who told you that?

19  A.          I believe Joy.

20  Q.          Did Mike share anything with you during

21  your shadow day about his experience or his

22  qualifications?

23  A.          Not that I can remember.

24  Q.          Do you remember seeing any sort of plaques

```
1    or anything on the wall near Mike's desk?

2    A.          No.

3    Q.          Let's pick up on Page 91 because we're now

4    on February 9.  You're asking can you do your

5    training from home.  She's saying not for pay.  We

6    don't allow that.

7                And your response is:  Joy, I'm willing to

8    work Lincoln Village or West Gate.  At this point,

9    that's it.

10               Why did you write that?

11   A.          Why did I write what?

12   Q.          Joy, I'm willing to work Lincoln Village

13   or West Gate.  At this point, that's it.

14   A.          Because that's how I felt.

15   Q.          At this point, have you been to the

16   Reynoldsburg store at all?

17   A.          I don't know.  I don't think so.  I'm not

18   sure.

19   Q.          Turn to Page 92.  Joy says:  I just left

20   you a message.  Please call me.  And Tuesday at

21   1:53 p.m.:  Kaitlyn, I need to let you know -- I need

22   you to let me know about your text.  Are you

23   staying -- I think she's trying to say:  Are you

24   saying you will not work at Reynoldsburg?  Is that
```

 1    how you interpreted that?

 2    A.         Yes.

 3    Q.         And the response is on Page 93:  I think

 4    we should sit down and discuss it.  Yes.  My concern

 5    was the environment.  I'm progressive, and I'm not

 6    sure Reynoldsburg is a good fit.  It would create

 7    frustration in my position.  I'm not willing to

 8    shadow someone who is not doing this right.

 9               Have I read that right?

10    A.         Yes.

11    Q.         Did you ever end up having a conversation

12    with Joy in or around the time that you sent this

13    text on Page 93?

14    A.         No.

15    Q.         Did you leave any voicemails for Joy?

16    A.         I don't remember.

17    Q.         Any other texts other than this one on

18    Page 93 connected with this?

19    A.         I can't say for sure.  I don't have the

20    original feed.

21    Q.         Page 94 Joy texts you:  I've tried to call

22    with no success.  The position being offered to you

23    as a tax preparer at Reynoldsburg, please think about

24    whether you will accept or decline and send a

```
1    response to both me and Tony in writing by the end of

2    the day.  I have back to back appointments today, so

3    I will need to know by 9:00.  Thank you.

4              Did you respond by a -- with a phone call

5    at all?

6    A.        I don't recall.

7    Q.        If we turn the page to Page 95, you write:

8    I don't appreciate how you hired someone in my place

9    before I accepted a position, and you treat me as

10   though this is it, and this is all I have.  I'll take

11   the position I was hired for because I was pushed out

12   due to the company's need -- and the company's needs

13   since I need to let you know in writing.

14             And I think this is the continuation,

15   Kaitlyn:  I'll be reporting from my position as hired

16   tomorrow.  Let me know in writing whether or not

17   you're letting me know you illegally replaced me or

18   not.

19             We're now on Page 97, and Joy writes:  I

20   appreciate your thoughts.  You were given the option

21   of tax preparer knowing full well it would be in

22   Reynoldsburg and then accepted the offer by

23   completing the rapid class and asking for the pay

24   raise.  You no longer wish to be a tax preparer at
```

1    Reynoldsburg, so there is currently no other position

2    for you in our organization.  I wish you the best of

3    luck.  Thank you.

4            Did you have any sort of telephone call

5    with Mike -- or excuse me -- with Tony Marucco or Joy

6    or anyone else at Two Guys in response to receiving

7    and reading the text that's on Page 97 of Exhibit D?

8    A.        I believe there was a phone conversation

9    between myself and Tony as well as myself and Joy.

10   Q.        And did that happen in response to

11   receiving this text that's on Page 97?

12   A.        It was in response to the text from Page

13   94.

14   Q.        Okay.  Did you tape that call?

15   A.        No.

16   Q.        Was there anyone in the room with you when

17   that you had conversation?

18   A.        Shaniqua was at the time.

19   Q.        Were you on speakerphone?

20   A.        Yes.

21   Q.        Why?

22   A.        Because my phone can do it.  There was no

23   specific reason.

24   Q.        Was it the case that in your mind you

1    wanted to have witnesses to the conversation, and

2    that's why you were on speakerphone?

3    A.          No.  I think that my phone functions as

4    either a speaker or a non-speakerphone, so I used it.

5    Q.          Well, Shaniqua can't hear your

6    conversation if you're not on a speakerphone.

7    A.          That's not true.  But it's neither here

8    nor there.

9    Q.          Well, let's talk about the "hear" part of

10   that.  It is the case that if you are on speakerphone

11   and Shaniqua is in the room, she can necessarily hear

12   it better than if she was standing right next to you,

13   fair?

14   A.          At any rate, she was sitting next to me,

15   so she would have heard the conversation either way.

16   Q.          And you wanted her to hear that

17   conversation?

18   A.          There was no wanting her to hear it.  I

19   was having a conversation.

20   Q.          Did she insist on being there to hear the

21   conversation?

22   A.          No.

23   Q.          Okay.  Did you let her know, "Hey, this is

24   a call from work.  Stick around.  I want you to hear

```
 1    this"?
 2    A.          No.  We were both in a moving car.  I
 3    don't think she could have exited the vehicle.
 4    Q.          Did Shaniqua tape the conversation?
 5    A.          No.
 6    Q.          If I read Page 97, it sounds like you've
 7    been told it's Reynoldsburg or bust, fair?
 8    A.          Yeah.
 9    Q.          And on Page 98, your response to being
10    told it's Reynoldsburg or bust is:  Don't twist my
11    words.  I'll speak with Mary and Tony.  Plenty of
12    receptionists are doing the rapid class as well as
13    everyone I've worked with -- Let me start over.
14                Don't twist my words.  I'll speak with
15    Mary and Tony.  Plenty of receptionists are doing the
16    rapid class as well as everyone I worked with felt
17    just as I.  The company's collective left me no
18    choice.  That's why the day I was asked to train my
19    replacement, you asked what I was doing, as I was
20    replaced.  I'm not entertaining this with you.  I'll
21    be reporting for what I was hired for and reaching
22    out to HR.  The raise was given me to me as a
23    receptionist before tax was brought up, but it was a
24    nice try.  And in response --
```

1    A.        Where are you reading?

2    Q.        I'm reading at the end of Page 98 and on

3    the beginning of -- end of 99.

4    A.        Can I see your page?

5    Q.        Did I miss a page on yours?  Did you go

6    from 98 to 99?

7    A.        Yeah.  But this doesn't make sense as a

8    conversation.  I don't think this is what came after.

9    Q.        It's actually a carryover.  You're talking

10   about what's on 99?

11   A.        Oh, is this starting here from here?

12   Q.        Yeah.

13   A.        From midway up here?

14   Q.        It goes numerically.  So it started on 98.

15   A.        Okay.  I see.

16   Q.        And then it finishes on 99.

17   A.        What was your question?

18   Q.        The employer has the right to dictate

19   where the employee does the work, don't they?

20   A.        I don't know what the law is for that.

21   Q.        Well, let's assume that's the case.

22   A.        I don't assume much.  But --

23   Q.        You should probably do this in this case

24   at least for purposes of this question.

```
1              MS. BREEDLOVE:  Objection.

2              Don't assume anything.

3   BY MR. HERSHBERGER:

4   Q.         If you decided that you wanted to work

5   someplace else and the employer was not accommodating

6   you, what are your options?

7   A.         Could you repeat that?

8   Q.         Sure.  Let's say you were working at Pep

9   Boys at a certain location and you decide, you know,

10  "I'd really like to work somewhere else.  I know

11  there's a Pep Boys store there.  I need you to

12  transfer me."

13             Can the employer refuse to do that?

14             MS. BREEDLOVE:  Objection.

15  A.         Yes.

16  Q.         If the employer has work for an employee

17  at a different location, isn't it okay for the

18  employer to tell the employee to do the work at that

19  location?

20             MS. BREEDLOVE:  Objection.

21  A.         No.

22  Q.         In your estimation, that would be unfair?

23  A.         It would be not agreed upon.

24  Q.         Okay.  And that was your concern, is that
```

```
1   they were breaching what you claimed to be an

2   agreement for you to work at West Gate?

3   A.          The employment is an agreement.

4   Q.          It is of a certain nature, and I would

5   never dispute that.  But when it's employment

6   at-will, there's some consequences; and I won't bore

7   you with that.  But my fundamental question is:  The

8   concern that you're expressing here on Pages 94

9   through 99 is, "Hey, I feel that you kind of did a

10  bait and switch on me.  You hired me as a

11  receptionist, and now you're telling me because I

12  took the tax preparer course, you know, you can put

13  me somewhere else."  Is that a fair and accurate

14  argument that you were going to be making there?

15           MS. BREEDLOVE:  Objection.

16  A.          No.  It's not.

17  Q.          I mean, I've read what's written here.  So

18  I'm trying to figure out what your concern actually

19  was other than what's actually written on these pages

20  because I've heard your testimony about, "I think

21  that they breached an agreement with me."  Is there

22  something more?

23  A.          I'm confused at what you're asking.

24  Q.          Sure.  You think it's unfair for Two Guys
```

1   to mandate that you work at the Reynoldsburg store as

2   a tax preparer, right?

3   A.        I believe that the situation that lead to

4   that request was not okay.

5   Q.        My question is this -- and I'll just

6   rephrase it again -- you felt it was unfair for Two

7   Guys to ask you to work at Reynoldsburg as a tax

8   preparer?

9   A.        I don't feel like it's unfair for anybody

10  to ask a question, no.

11  Q.        I'll use a different verb.  Two Guys

12  directed you to work at the Reynoldsburg -- and to

13  report to the Reynoldsburg store, did they not?

14  A.        Yes.

15  Q.        And you refused to do that, didn't you?

16  A.        No, I did not.

17  Q.        Did you go to work at the Reynoldsburg

18  store?

19  A.        Yes, I did.

20  Q.        When?

21  A.        February 8 or February 9.

22  Q.        We just read the texts from February 8 and

23  February 9.

24            So let's go back and explore this again

1    contextually.

2              We started on Page 92.  We are on February

3    9.  And the text that's there from Joy is:  Kaitlyn,

4    I need you to let me know about your text.  Are you

5    saying you will not work at Reynoldsburg?

6              And your response on Page 93 is:  I think

7    we should sit down and discuss it, yes.

8              And you expressed your concerns about the

9    environment, you being progressive, you not being

10   sure it's a good fit.  You're thinking it's going to

11   create frustration in your position, you not being

12   willing to shadow someone who you think is not doing

13   it right.  I've expressed all the reasons for you not

14   wanting to be at Reynoldsburg, right?

15   A.        Some of them I mentioned at the very

16   beginning in the first sentence, that I feel like we

17   should sit down and discuss it.  So not all of my

18   issues were addressed.

19   Q.        Okay.  Were there other issues that were

20   discussed with Tony and Joy when you had a call in

21   connection with this colloquy that goes from Pages 92

22   to 99 and 100?

23   A.        I do not remember.

24   Q.        Do you recall the substance of any

1  communication you had with Tony in response to these

2  text messages and the subjects that are being raised

3  and the concerns that you raised including those on

4  Page 93?

5  A.        I do not recall the conversation with

6  Tony, no.

7  Q.        Did you tell Tony about the rounding

8  incidents?

9  A.        I don't think I had a conversation with

10  Tony about that incident.

11  Q.        Okay.

12  A.        But I don't remember.

13  Q.        Did you have a conversation with Tony

14  about Joy learning that you were a lesbian?

15  A.        I was discharged from the company after

16  that day.  I had no conversations with anybody.

17  Q.        So you had no communications with anybody

18  at Two Guys about Joy learning that you were a

19  lesbian?

20  A.        I was discharged from the company.

21  Q.        And thereafter you had no further

22  conversations with the company about either the

23  rounding incidents or the issue about Joy learning

24  that you were a lesbian?

Kaitlyn Porter
4/26/2022

182

```
 1    A.          Correct.

 2                MR. HERSHBERGER:  I'm going to talk with

 3    her out in the hall.

 4                        (Recess taken.)

 5                MR. HERSHBERGER:  Back on the record.

 6                I have no further questions.  Kaitlyn, you

 7    have the right to read your deposition transcript.

 8    Is she going to assert that?

 9                MS. BREEDLOVE:  She'll read.

10                     (Signature not waived.)

11                            - - -

12                And, thereupon, the deposition was

13    concluded at approximately 2:57 p.m.

14                            - - -

15

16

17

18

19

20

21

22

23

24
```

Kaitlyn Porter
4/26/2022

183

```
1    State of Ohio      :
                          SS:
2    County of Franklin :

3              I, KAITLYN PORTER, do hereby certify that

4    I have read the foregoing transcript of my deposition

5    given on April 26, 2022; that together with the

6    correction page attached hereto noting changes in

7    form or substance, if any, it is true and correct.

8

9                      _____

10                     KAITLYN PORTER

11             I do hereby certify that the foregoing

12   transcript of the deposition of KAITLYN PORTER was

13   submitted to the witness for reading and signing;

14   that after she had stated to the undersigned Notary

15   Public that she had read and examined her deposition,

16   she signed the same in my presence on the

17   _____day of _____, _____.

18                      _____

19                      _____

20                      Notary Public

21   My commission expires _____

22                      - - -

23

24
```

```
 1                        CERTIFICATE
        State of Ohio     :
 2                         SS:
        County of Franklin:
 3                I, Marilyn K. Martin, Notary Public in and

 4      for the State of Ohio, duly commissioned and

 5      qualified, certify that the within named witness was

 6      by me duly sworn to testify to the whole truth in the

 7      cause aforesaid; that the testimony was taken down by

 8      me in stenotypy in the presence of said witness,

 9      afterwards transcribed upon a computer; that the

10      foregoing is a true and correct transcript of the

11      testimony given by said witness taken at the time and

12      place in the foregoing caption specified.

13                I certify that I am not a relative,

14      employee, or attorney of any of the parties hereto,

15      or of any attorney or counsel employed by the

16      parties, or financially interested in the action.

17                IN WITNESS WHEREOF, I have set my hand and

18      affixed my seal of office at Columbus, Ohio, on this

19      24th day of June, 2022.

20                _____

21
        MARILYN K. MARTIN
22      Notary Public in and for the State of Ohio
        and Registered Professional Reporter.
23

24      My Commission Expires October 16, 2026.
```